HECKLER, SECRETARY OF HEALTH AND HUMAN
SERVICES *v.* DAY ET AL.

No. 82–1371.   Argued December 5, 1983—Decided May 22, 1984

*Assistant Attorney General McGrath* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Deputy Solicitor General Geller, Edwin S. Kneedler,* and *John F. Cordes.*

*Richard H. Munzing* argued the cause for respondents. With him on the brief was *Henry A. Freedman.** 

JUSTICE POWELL delivered the opinion of the Court.

The question presented is the validity of an injunction issued on behalf of a statewide class that requires the Secretary of Health and Human Services to adjudicate all future disputed disability claims under Title II of the Social Security Act, 42 U. S. C. § 401 *et seq.*, according to judicially established deadlines and to pay interim benefits in all cases of noncompliance with those deadlines.

I

Title II of the Social Security Act (Act) was passed in 1935. 49 Stat. 622, as amended, 42 U. S. C. § 401 *et seq.* Among other things, it provides for the payment of disability insur-

---

*Briefs of *amici curiae* urging affirmance were filed for the Alliance of Social Security Disability Recipients et al. by *Eileen P. Sweeny* and *Bonnie M. Milstein;* and for the City of New York by *Frederick A. O. Schwarz, Jr.,* and *Leonard Koerner.*

ance benefits to those whose disability prevents them from pursuing gainful employment. 42 U. S. C. § 423.[1] Disability benefits also are payable under the Supplemental Security Income (SSI) program established by Title XVI of the Act, 76 Stat. 197, as amended, 42 U. S. C. § 1381. The disability programs administered under Titles II and XVI "are of a size and extent difficult to comprehend." *Richardson* v. *Perales*, 402 U. S. 389, 399 (1971). Approximately two million disability claims were filed under these two Titles in fiscal year 1983.[2] Over 320,000 of these claims must be heard by some 800 administrative law judges each year.[3] To facilitate the orderly and sympathetic administration of the disability program of Title II, the Secretary and Congress have established an unusually protective four-step process for the review and adjudication of disputed claims. First, a state agency determines whether the claimant has a disability and the date the disability began or ceased.[4] 42 U. S. C. § 421(a); 20 CFR § 404.1503 (1983). Second, if the claimant is dissatisfied with that determination, he may request reconsideration of the determination. This involves a *de novo* reconsideration of the disability claim by the state agency,

---

[1] Section 423(d)(1) defines "disability" as:

"(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

Any disability benefits payable under § 423 are paid out of the Federal Disability Insurance Trust Fund, which is funded by payroll taxes. 42 U. S. C. § 401(b).

[2] Social Security Administration, 1983 Annual Report to Congress 43–44 (1983).

[3] U. S. Dept. of Health and Human Services, Office of Hearings and Appeals, Key Workload Indicators 1, 16 (May 1983) (hereinafter Key Workload Indicators). In May 1983, the average number of cases pending per administrative law judge stood at a record 221. *Id.*, at 1.

[4] The state agency acts under the authority and control of the Secretary. See 42 U. S. C. § 421(a).

and in some cases a full evidentiary hearing. §§ 404.907–404.921. Additional evidence may be submitted at this stage, either on the request of the claimant or by order of the agency. Third, if the claimant receives an adverse reconsideration determination, he is entitled by statute to an evidentiary hearing and to a *de novo* review by an Administrative Law Judge (ALJ). 42 U. S. C. § 405(b); 20 CFR §§ 404.929–404.961 (1983). Finally, if the claimant is dissatisfied with the decision of the ALJ, he may take an appeal to the Appeals Council of the Department of Health and Human Services (HHS).[5] §§ 404.967–404.983. These four steps exhaust the claimant's administrative remedies. Thereafter, he may seek judicial review in federal district court. 42 U. S. C. § 405(g).

In this class action, the named plaintiffs sought declaratory and injunctive relief from delays encountered in steps two and three above. The action was initiated by Leon Day in November 1978 after his disability benefits were terminated and he suffered substantial delays in obtaining a reconsideration determination and in securing a hearing before an ALJ.[6] After suffering similar delays, Amedie Maurais intervened in the action.[7] On June 14, 1979, the District Court certified a statewide class consisting of:

"All present and future Vermont residents seeking to secure Social Security disability benefits who, following an initial determination by the defendant that no disability

---

[5] New material evidence may be submitted to the Appeals Council. The Council then reviews all the evidence and will reverse the ALJ's determination only if it finds that the determination is "contrary to the weight of the evidence currently in the record." 20 CFR § 404.970(b) (1983).

[6] Day was forced to wait 167 days for a reconsideration determination. He received a hearing before the ALJ 173 days after his hearing request. App. to Pet. for Cert. 13a–14a.

[7] Maurais waited 215 days for a reconsideration determination after his disability benefits were terminated. He was given a hearing before an ALJ 65 days after his hearing request. *Id.*, at 14a.

exists, experience an unreasonable delay in the scheduling of and/or issuance of decisions in reconsiderations and fair hearings." App. to Pet. for Cert. 12a, n. 1.

Plaintiffs argued before the District Court that the delays they had experienced violated their statutory right under 42 U. S. C. § 405(b) (1976 ed., Supp. V) to a hearing within a reasonable time.[8] Both parties submitted the case to the District Court on motions for summary judgment. On the basis of the undisputed evidence, the District Court held that, as to all claimants for Title II disability benefits in Vermont, delays of more than 90 days from a request for hearing before an ALJ to the hearing itself were unreasonable.[9] It granted partial summary judgment to the plaintiff class on that issue in December 1979.

After the submission of additional evidence, the District Court considered motions for summary judgment concerning the reasonableness of delays in the reconsideration process. The additional evidence also was undisputed. It consisted of factual summaries of 77 randomly selected disability cases submitted by the Secretary. The District Court noted that the "summaries support the positions of both parties. They show the reconsideration process is often time consuming and

---

[8] That section provides that after any unfavorable determination of disability, the claimant, on request, shall be entitled to "reasonable notice and opportunity for a hearing with respect to such decision."

[9] The evidence submitted by the Government showed that 57% of the hearings requested in Vermont after January 1978 were scheduled within 90 days, with a range of delays varying between two and nine months. Id., at 15a. The District Court rejected the Secretary's claim that the delays were necessary to ensure quality decisions and to protect the limited resources of the Social Security program. It held that "[w]hile the SSA has made admirable strides in reducing the average length of delay experienced by claimants a few years ago, we [believe] . . . that the SSA is not warranted in forcing claimants to endure such lengthy delays without benefits, while it puts its administrative appeals process in order." Id., at 17a–18a.

complex. They also show that the process is replete with unexplained delay; other requests are processed with commendable dispatch." App. to Pet. for Cert. 25a. In 27 of the 77 cases, reconsideration determinations took longer than 90 days. In each of these 27, the District Court concluded that the delays were caused by agency inefficiencies and were not justified by the "necessary steps in the reconsideration process." *Id.*, at 28a. On the basis of this survey, the District Court concluded that, as a rule, delays of more than 90 days in making reconsideration determinations were unreasonable and violated the claimant's statutory rights.[10] In August 1981, the District Court granted summary judgment for respondents on the reconsideration aspect of the case.

In November 1981, the District Court issued an injunction in favor of the statewide class that "ordered and directed [the Secretary] to conclude reconsideration processing and issue reconsideration determinations within 90 days of requests for reconsideration made by claimants."[11] The injunction also required ALJs to provide hearings within 90 days after the

---

[10] There is no express statutory requirement that reconsideration determinations be conducted within a reasonable time. The District Court reasoned, however, that because the reconsideration determination was an "administrative prerequisite" to an administrative hearing, "[u]nreasonable delays in the reconsideration procedures trench on the statutory duty to provide a hearing within a reasonable time." *Id.*, at 27a. That reasoning is not challenged here.

[11] The order exempted reconsideration determinations from the 90-day deadline in the following circumstances:

"(a) The claimant offers new medical evidence or reports new medical treatment since his initial determination;

"(b) The claimant agrees to undergo a consultative examination when one is suggested by the defendant;

"(c) The claimant or his representative causes a delay by failing to provide information needed for reconsideration;

"(d) The claimant or his representative requests a delay; or,

"(e) The delay is in some other way attributable to the aggrieved claimant or his representative." *Id.*, at 33a.

request is made by claimants.[12]   Finally, it ordered payment of interim benefits to any claimant who did not receive a reconsideration determination or hearing within 180 days of the request for reconsideration or who did not receive a hearing within 90 days of the hearing request.[13]   The Court of Appeals for the Second Circuit affirmed the District Court's determination that the challenged delays violated the statute and upheld the District Court's remedial order.   *Day* v. *Schweiker*, 685 F. 2d 19 (1982).   We granted certiorari to consider whether it is appropriate for a federal court, without statutory authorization, to prescribe deadlines for agency adjudication of Title II disability claims and to order payment of interim benefits in the event of noncompliance.   461 U. S. 904 (1983).[14]   We conclude that the legislative history makes

---

[12] The order exempted hearing requests from the 90-day deadline in the following circumstances:

"(a) The claimant or his representative causes a delay by failing to provide information needed for adjudication;

"(b) The claimant or his representative requests a delay;

"(c) The claimant or his representative fails to appear for the scheduled hearing[;]

"(d) The delay is in some other way attributable to the claimant or his representative." *Id.*, at 34a.

[13] Because the District Court held that the challenged delays violated § 405(b), it did not reach plaintiffs' claims that the delays violated the Administrative Procedure Act or their due process rights under the Fourteenth Amendment.

[14] We note at the outset that the District Court had jurisdiction to consider respondents' statutory claim under 42 U. S. C. § 405(g).   There are two prerequisites to § 405(g) jurisdiction.   *Mathews* v. *Eldridge*, 424 U. S. 319, 328 (1976); *Weinberger* v. *Salfi*, 422 U. S. 749, 763–767 (1975).   The nonwaivable jurisdictional requirement that a claim for benefits shall have been presented to the Secretary has been met here.   The jurisdictional requirement that administrative remedies be exhausted is waivable.   In the present case, the Secretary has not challenged the sufficiency of respondents' efforts to exhaust administrative remedies.   We interpret this to be a waiver by the Secretary of the exhaustion requirement under § 405(g). See *Salfi, supra,* at 767.

clear that Congress, fully aware of the serious delays in resolution of disability claims, has declined to impose deadlines on the administrative process. Accordingly, we vacate the judgment below.

## II

The Secretary does not challenge here the determination that § 405(b) requires administrative hearings to be held within a reasonable time. Nor does she challenge the District Court's determination that the delays encountered in the cases of plaintiffs Day and Maurais violated that requirement.[15] She argues only that a statewide injunction that imposes judicially prescribed deadlines on HHS for all future disability determinations is contrary to congressional intent and constitutes an abuse of the court's equitable power. She argues in the alternative that even if the injunction is appropriate, the order requiring payment of interim benefits in cases of noncompliance is not. The Secretary looks primarily to legislative history to support both arguments.

## A

The Secretary correctly points out that Congress repeatedly has been made aware of the long delays associated with resolution of disputed disability claims and repeatedly has considered and expressly rejected suggestions that mandatory deadlines be imposed to cure that problem.[16] She ar-

---

[15] Nor do we understand the Secretary to dispute the District Court's determination that the 27 sample cases it studied evidenced statutory violations of the reasonableness requirement.

[16] The delays are not a recent development. In fiscal year 1973, the median time between hearing request and posthearing disposition was 174 days. The mean processing time reached a high in fiscal year 1976 at 288 days. At the time this action was filed in District Court (November 1978), the mean processing time was 151 days. Key Workload Indicators 1. As the District Court observed, "the [Secretary] has made admirable strides in reducing the average length of delay experienced by claimants a few years ago." See n. 9, *supra.*

gues that Congress expressly has balanced the need for timely disability determinations against the need to ensure quality decisions in the face of heavy and escalating workloads and limited agency resources.   In striking that balance, the Secretary argues, the relevant legislative history also shows that Congress to date has determined that mandatory deadlines for agency adjudication of disputed disability claims are inconsistent with achievement of the Act's primary objectives, and that the District Court's statewide injunction flatly contradicts that legislative determination.   We find this argument persuasive.

Congressional concern over timely resolution of disputed disability claims under Title II began at least as early as 1975.[17]   It has inspired almost annual congressional debate since that time.[18]   The consistency with which Congress has expressed concern over this issue is matched by its consistent refusal to impose on the Secretary mandatory deadlines for resolution of disputed disability claims.

In 1975, the House Social Security Subcommittee held hearings on the delays encountered in resolving disputed Social Security claims,[19] and 60 Members of the House sponsored a bill imposing statutory deadlines for each step in the

---

[17] See Delays in Social Security Appeals: Hearings before the Subcommittee on Social Security of the House Committee on Ways and Means, 94th Cong., 1st Sess. (1975) (hereinafter 1975 Hearings).

[18] See, e. g., Disability Insurance Program: Public Hearings before the Subcommittee on Social Security of the House Committee on Ways and Means, 94th Cong., 2d Sess., 341–343 (1976); Administrative Law Judges, HEW Executive Level Positions, and Salary Adjustment for Director of Office of Management and Budget: Hearings before the Subcommittee on Employee Ethics and Utilization of the House Committee on Post Office and Civil Service, 95th Cong., 1st Sess., 10–11, 16–17 (1977); Disability Insurance Program—1978: Hearings before the Subcommittee on Social Security of the House Committee on Ways and Means, 95th Cong., 2d Sess., 15–17, 97–99 (1978).

[19] See 1975 Hearings.

administrative review of disputed SSA claims.[20] Expressions of concern were voiced in both the Senate and the House over the "huge backlog of some 103,000 cases awaiting hearing" before an ALJ. S. Rep. No. 94–550, p. 3 (1975); accord H. R. Rep. No. 94–679, pp. 1–2 (1975).[21] Despite this concern, the Staff of the House Subcommittee advised against statutory deadlines because of the potential "adverse effect on the quality and uniformity of disability adjudication which is already somewhat suspect." Staff of the Subcommittee on Social Security of the House Committee on Ways and Means, Appeals Process: Areas of Possible Administrative or Legislative Action, 94th Cong., 1st Sess., 1–2 (Comm. Print 1975).[22] Congress agreed and refused to impose statutory deadlines on the Secretary.

Bills proposing statutory deadlines have been proposed almost annually since 1975,[23] and congressional concern over the delay problem has remained high. For example, in 1980 Congress directed the Secretary to submit a report recommending the establishment of appropriate and realistic deadlines for resolution of disputed SSA claims. It ordered the

---

[20] H. R. 5276, 94th Cong., 1st Sess. (1975). That bill proposed the following deadlines: 90 days for an initial determination of eligibility; 90 days for a reconsideration determination; 120 days from hearing request to posthearing decision; and 120 days for a decision by the Appeals Council.

[21] By the end of fiscal year 1975, there was a backlog of 111,169 cases, and a mean processing time of 262 days from hearing request to posthearing decision. Key Workload Indicators 1.

[22] The concern was expressed throughout the House hearings that mandatory deadlines would worsen the situation of an already overburdened staff, thereby jeopardizing the quality of agency decisions. See, e. g., 1975 Hearings 8 ("Equally important as speed of processing of cases, is the question of the quality of adjudication"); id., at 17 ("Heavier work loads and efforts to increase individual ALJ production place more strain on the quality of adjudication").

[23] See H. R. 12466, 94th Cong., 2d Sess. (1976); H. R. 5151, 95th Cong., 1st Sess. (1977); H. R. 12672, 95th Cong., 2d Sess. (1978); H. R. 747, 96th Cong., 1st Sess. (1979); H. R. 4775, 97th Cong., 1st Sess. (1981).

Secretary in doing so to consider "both the need for expeditious processing of claims for benefits and the need to assure that all such claims will be thoroughly considered and accurately determined." Pub. L. 96–265, § 308, 94 Stat. 458, note following 42 U. S. C. § 401. The Senate Report explained that "Congress could then evaluate the recommendations for consistency with the elements it wishes to emphasize and, if needed, take further action next year." S. Rep. No. 96–408, p. 59 (1979).[24] The Secretary submitted a report in October 1980, suggesting deadlines of 150 days for reconsideration determinations and 165 days from hearing to posthearing decision, both subject to certain exceptions. U. S. Dept. of Health and Human Services, Report to Congress, Implementation of Section 308, Public Law 96–265, p. 1 (Oct. 21, 1980). The Secretary, however, cautioned Congress that budget and staff limitations and burgeoning workloads "mitigate *[sic]* against the Department meeting its proposed time limitation objectives in every instance." *Id.*, at 2. Since receiving the Secretary's report, Congress has refused to impose mandatory deadlines on the Secretary, or to direct her to promulgate them herself.

Certainly in Congress the concern that mandatory deadlines would jeopardize the quality and uniformity of agency decisions has prevailed over considerations of timeliness. In its most recent comment on the subject, the House Commit-

---

[24] In requesting recommendations from the Secretary, Congress faced opposition from those who continued to press for statutory deadlines. See Disability Insurance Legislation: Hearings before the Subcommittee on Social Security of the House Committee on Ways and Means, 96th Cong., 1st Sess., 114 (1979) (statement of Dennis M. Sweeney and Laura W. S. Macklin on behalf of the Administrative Law Center, etc.) ("[T]he problem of delays in the Social Security hearing system has been before Congress repeatedly and for a number of years. . . . At this point, HEW is well aware of the problems in this area. . . . [W]e respectfully submit that this is not the time to further study the delay problem. A provision in this bill suggesting a study from HEW . . . can only be read as an invitation to further delay cleaning up the hearing process and getting rid of the unreasonable and unnecessary delays").

tee on Ways and Means expressly disapproved mandatory hearing deadlines and indicated disagreement with recent judicial decisions imposing such time restrictions. Criticizing the decision in *Blankenship* v. *Secretary of HEW*, No. C75–0185L(A) (WD Ky., May 6, 1976), which had imposed judicially prescribed hearing deadlines on the Secretary and ordered the payment of interim benefits in the event of noncompliance,[25] the Committee reported:

> "[The] Committee believes that a disability claimant is entitled to a timely hearing and decision on his appeal, but it also recognizes that the time needed before a well-reasoned and sound disability hearing decision can be made may vary widely on a case-by-case basis. . . . Establishing strict time limits for the adjudication of every case could result in incorrect determinations because time was not available to . . . reach well-reasoned decisions in difficult cases." H. R. Rep. No. 97–588, pp. 19–20 (1982).[26]

---

[25] The District Court's original unpublished memorandum opinion required the Secretary to comply with a hearing request within 90 days. The Court of Appeals for the Sixth Circuit reversed that order and remanded for the Secretary to issue regulations promulgating mandatory deadlines. *Blankenship* v. *Secretary of HEW*, 587 F. 2d 329 (1978). On remand, the Secretary attempted to promulgate such regulations, but concluded that unpredictable caseloads made deadlines impossible. The Secretary then petitioned the District Court for relief from the requirement that she promulgate deadlines. The District Court refused and ordered the Secretary to promulgate the regulations. *Blankenship* v. *Secretary of Health & Human Services*, 532 F. Supp. 739 (WD Ky. 1982). The Sixth Circuit affirmed on appeal. *Blankenship* v. *Schweiker*, 722 F. 2d 1282 (1983). JUSTICE O'CONNOR has stayed the District Court's order requiring the Secretary to promulgate regulations pending our decision in this case. *Heckler* v. *Blankenship*, 465 U. S. 1301 (1984).

[26] This clear expression of congressional disapproval refutes the dissent's suggestion that Congress implicitly has endorsed judicially mandated deadlines by failing to repudiate those judicial decisions that have imposed them. See *post*, at 125–126. There is simply no basis for the dissent's proposition that this passage "when read in context, supports only the inference that Congress chose not to 'assert its power to give the district

Finally, the Secretary points out that judicially imposed deadlines may vary from case to case and from State to State, requiring HHS to shuffle its staff nationwide. Not only would this tend seriously to disrupt agency administration, but wide variations in judicially imposed deadlines also would prevent realization of Congress' oft-repeated goal of uniform administration of the Act. See, *e. g.*, S. Rep. No. 96–408, pp. 52–56 (1979) (emphasizing concern over "state-to-state" variations and expressing hope that current legislation would "both improve the quality of determinations and ensure that claimants throughout the Nation will be judged under the same uniform standards *and procedures*") (emphasis added).[27]

## B

Legislation enacted by Congress in 1980 and 1982 is fully consistent with the repeated rejection of proposals for mandatory deadlines and with efforts by Congress to ensure qual-

---

courts more specific direction.'" *Post*, at 127, n. 8 (quoting *White* v. *Mathews*, 559 F. 2d 852, 861 (CA2 1977), cert. denied, 435 U. S. 908 (1978)).

A 1981 Committee Staff Report recommended that quality should no longer be sacrificed for promptness:

"Back in 1975, [the SSA] gave lip service to quality, worrying primarily about processing time and case backlog. . . .

. . . . .

"Beginning in 1978, the Subcommittee examined in some depth two State agencies—New York and New Jersey—which were expediting cases at the expense of quality with the tacit consent of SSA's Regional Office in New York. Their operations have still not fully recovered. . . . One of the recommendations made by the Social Security Administration . . . was that the State adjudicators 'should be reminded that (1) the goal of adjudication quality takes precedence over that of expeditious processing and (2) that adjudicators should use whatever time is necessary to secure essential medical evidence.'" Staff of the Subcommittee on Social Security of the House Committee on Ways and Means, Status of the Disability Insurance Program, 97th Cong., 1st Sess., 12–13 (Comm. Print 1981).

[27] The dissent's suggestion that Congress meant to prohibit only *nationwide* and not *statewide* deadlines is unpersuasive. The legislative history suggests no distinction between the two. Moreover, injunctive orders imposing varying deadlines from State to State would defeat the express congressional goal of uniformity. See S. Rep. No. 96–408, pp. 52–56 (1979).

ity and uniformity in agency adjudication. In 1980, Congress amended § 405(b) to require that every initial determination of ineligibility contain an easily understandable discussion of the evidence and the reasons for the determination. Pub. L. 96–265, 94 Stat. 457, 42 U. S. C. § 405(b). At the same time, Congress added § 421(i) to require a tri-annual assessment of the continuing eligibility of recipients of disability benefits. Pub. L. 96–265, 94 Stat. 460, 42 U. S. C. § 421(i). Congress also included in the 1980 amendments a requirement that the Secretary review at least 65% of all determinations of eligibility made by state agencies in any fiscal year after 1982. Pub. L. 96–265, 94 Stat. 456, 42 U. S. C. §§ 421(c)(2), (3).[28] Before 1972, the Secretary had reviewed the majority of state determinations as a matter of course. A growing workload required the Secretary to abandon this practice for a sample review of only 5% of the state agency determinations. H. R. Rep. No. 96–100, p. 10 (1979). The 1980 amendment, requiring review of a substantially higher percentage of state agency disability determinations, presumably will have an effect on the timely resolution of disputed disability claims.[29]

Finally, in 1983 Congress provided that effective January 1, 1984, an initial determination that previously granted disability benefits should be terminated entitles the claimant not only to a *de novo* review on reconsideration, but to a full evidentiary hearing as well. Pub. L. 97–455, 96 Stat. 2499, 42 U. S. C. § 405(b)(2). All of these changes will impose additional duties on the Secretary and her heavily burdened staff. In light of Congress' continuing concern that mandatory deadlines would subordinate quality to timeliness, and its recent efforts to ensure the quality of agency determinations,

---

[28] The 1980 amendments also authorized the Secretary to review determinations of ineligibility on her own motion. 42 U. S. C. § 421(c)(1).

[29] The legislative history of this amendment suggests that Congress was concerned that undue emphasis on expediting resolution of disputed claims had resulted in a marked loss of quality and uniformity in agency decisions. See, *e. g.*, S. Rep. No. 96–408, pp. 52–56 (1979).

it hardly could have contemplated that courts should have authority to impose the very deadlines it repeatedly has rejected.[30]

## C

Persuasive evidence of the intention of Congress also is found in the distinction it has made between the resolution of SSI claims for old-age and survivor benefits and SSI claims for disability benefits. Section 405(b), governing eligibility determinations under Title II, and § 1383(c)(1), governing eligibility determinations under Title XVI, are virtually identical. In the event of adverse determinations, both require the Secretary to provide claimants with "reasonable notice and opportunity for a hearing." In the case of disputed SSI claims, however, § 1383(c)(2) requires a posthearing decision within 90 days of the hearing request, except in the case of disputed disability claims. This provision makes two things clear: (i) Congress will establish hearing deadlines when it deems them appropriate; and (ii) Congress has determined that it is inappropriate to subject disputed disability claims to mandatory deadlines.[31]

## III

The Secretary also contends that quite apart from the congressional rejection of the mandatory deadlines discussed above, the District Court's order unduly intruded upon the

---

[30] The suggestion made by the dissent that this legislative history "has little relevance to the task before us," *post,* at 125, is mistaken. The legislative history set forth in this opinion demonstrates far more than simple congressional inaction in the face of acknowledged delays; it explicitly shows that Congress has rejected repeated demands for mandatory deadlines. We rarely see as clear an expression of congressional intent.

[31] As early as 1967, Congress recognized the difference between old-age and disability claims:

"The process of making disability determinations is significantly different from the retirement and survivors insurance claims process. In the disability process[,] State vocational rehabilitation agencies are involved importantly in the making of the decision[,] and in borderline cases[,] lengthy and extensive development of facts of a medical nature is often required." S. Rep. No. 744, 90th Cong., 1st Sess., 107 (1967).

discretion with which Congress has granted the Secretary to adopt rules and procedures for the adjudication of claims. See *Heckler* v. *Campbell,* 461 U. S. 458, 466 (1983); *Schweiker* v. *Gray Panthers,* 453 U. S. 34, 43–44 (1981); *Batterton* v. *Francis,* 432 U. S. 416, 425 (1977). We need not reach this broader contention, however, because of repeated congressional rejection of the imposition of mandatory deadlines on agency adjudication of disputed disability claims.[32] In light of the unmistakable intention of Congress, it would be an unwarranted judicial intrusion into this pervasively regulated area for federal courts to issue injunctions imposing deadlines with respect to future disability claims.[33] Accordingly, we vacate the judgment of the Court of Appeals, and remand the case for further proceedings consistent with this opinion.[34]

*It is so ordered.*

---

[32] In view of Congress' unequivocal determination that mandatory deadlines are inappropriate, the repeated references in the dissenting opinion to the "reasonableness" of the injunctive order at issue here are simply irrelevant. See *post,* at 121–122, n. 1, 132–133, 134–135. The dissent states that the injunction at issue is "carefully tailored," and assumes that the Secretary would have no difficulty complying with it. *Post,* at 120. Even if this assumption were correct, it hardly suggests that this Court should disregard the considered determination of Congress that mandatory deadlines are inappropriate.

[33] We make clear that nothing in this opinion precludes the proper use of injunctive relief to remedy *individual* violations of § 405(b). Our decision in this case is limited to the question whether, in view of the unequivocally clear intent of Congress to the contrary, it is nevertheless appropriate for a federal court to prescribe mandatory deadlines with respect to the adjudication of disability claims under Title II of the Act. We understand that the courts below were moved by long delays that well may have caused serious deprivations. But this does not justify imposing absolute periods of limitations applicable to all claims—limitations that Congress repeatedly has declined to enact.

[34] The District Court's order requiring the payment of interim benefits was conditioned on noncompliance with the injunction. Because we have held that the injunction is invalid, we need not address the propriety of that part of the District Court's order requiring payment of interim benefits.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

This case determines an issue of vital importance to the Social Security Administration, to disabled Vermont residents, and to federal courts. By failing to ground its opinion in the factual record of the case at hand, the majority has discarded a balanced remedy crafted to effectuate a federal statute. Far from intruding clumsily into a pervasively regulated area, *ante*, at 119, the District Court fashioned a meaningful, carefully tailored statewide remedy that mandated feasible, expeditious reconsideration determinations and hearings, that did not cause extra cost to the Secretary or reallocation to Vermont of resources from other States, and that did not harm other statutory goals such as quality and accuracy of decisionmaking. Because that remedy is not expressly or impliedly prohibited by the Constitution or by statute, and is not an abuse of discretion, I would affirm the judgment of the Court of Appeals.

I

A

As the majority opinion makes clear, the District Court's declaratory judgment that the plaintiff class is entitled to relief is not at issue. The Secretary concedes that 42 U. S. C. § 405(b) compels her to provide claimants a hearing on disputed disability determinations within a reasonable time. Cf., *e. g.*, *White* v. *Mathews*, 559 F. 2d 852, 858 (CA2 1977), cert. denied, 435 U. S. 908 (1978). The Secretary does not contest the District Court's conclusion that, because under the Secretary's regulations a hearing must be preceded by a reconsideration determination, see *ante*, at 106–107, such reconsiderations must also be completed within a reasonable time. The undisputed factual record, submitted primarily by the Secretary herself, supports the District Court's declaratory judgment that the Secretary had failed to fulfill her statutory duty to provide the class representatives and a large portion of the plaintiff class reconsideration determina-

tions and hearings within reasonable periods of time. While the Secretary challenges classwide relief, she has not challenged the District Court's certification of the plaintiff class. Our review, therefore, is limited to the equitable remedy crafted by the District Court and affirmed by the Court of Appeals.

## B

A fair assessment of the validity of the District Court's order requires a clear view of its content and the record on which it was based. In brief, the District Court ordered that a member of the plaintiff class—Vermont disability claimants whose benefits have been terminated and new applicants for disability entitlements—who requests review of an initial determination by the Secretary that he or she is not disabled must receive the Secretary's reconsideration within 90 days of his or her request for review. If the reconsideration is adverse and the claimant requests a hearing, the hearing must be held within 90 days of the request. However, both of these time limits are subject to exceptions which have tolling effect. If the Secretary does not provide a hearing within the time limits, she is required to provide interim benefits, which she may recoup if the claimant is ultimately found not to be entitled to benefits.[1]

---

[1] The occurrence of one of three events triggers the requirement that interim benefits be paid: the Secretary does not issue a reconsideration decision within 180 days of request; the Secretary fails to hold a hearing within 180 days (plus any delay attributable to the claimant) of a prior request for reconsideration followed by a request for a hearing; the Secretary fails to hold a hearing within 90 days of a request. App. to Pet. for Cert. 34a–35a. The Secretary retains the option under the District Court's conditional order either to conduct review within the established time periods, or to initiate recoupable payments. The agency thus is not operating under the threat of contempt actions for failure to comply with the time limits, and the remedy is consequently minimally intrusive.

Nor has the District Court intruded into the day-to-day operations of the agency. The District Court requested and accepted a plan drafted by the Secretary to implement the order. See App. 196–200. Vermont Title II

The District Court was careful to ensure that its order had no repercussions outside the State of Vermont. The certified class was limited to Vermont Title II claimants. The Secretary stated that the resources allocated by Congress to process hearing requests in that State were the resources she needed to do the job.[2] There was no evidence before the court that enforcing Vermont claimants' statutory right to timely hearings would require the Secretary to reallocate her resources to the detriment of disability claimants in other States.[3]

The District Court ordered compliance with the prescribed time limits only after reviewing extensive responses to interrogatories, in which the Secretary acknowledged not only that she was able to comply with those limits, but that it was her stated policy to do so.[4] The record also supported the court's decision to craft nine exceptions to those time limits. The Secretary argued that the review process required some flexibility, and specified a variety of circumstances in which delay in completing a reconsideration or scheduling a hearing was justified. The District Court tailored its remedy to accommodate each of the Secretary's submissions. If a claimant offers new medical evidence, reports new medical treat-

---

claimants' requests for reviews of adverse initial determinations of disability are flagged with a cover sheet that notes the dates by which reconsiderations and hearings should be held, and permits easy recordkeeping of any applicable exceptions that toll the time limits.

[2] Defendant's Answer to Interrogatories Nos. 16, 17, App. 49 (averring that three Administrative Law Judges are needed to conduct Title II disability hearings in Vermont and three have been assigned to the State).

[3] The Secretary agrees that she has been able to fulfill her obligation to provide timely hearings as defined by the District Court. Since the District Court's first injunction went into effect, the Secretary has been able to comply with the hearing timetable in all but one case, and she has done so without transferring any personnel or other resources into Vermont. Tr. of Oral Arg. 33, 51.

[4] Defendant's Answer to Interrogatories, Nos. 19, 24, App. 50, 52 (agency's established policy is to conduct hearings within 90 days of request).

ment since the initial determination, agrees to undergo a consultative examination when the Secretary so suggests, causes a delay by failing to provide the information needed to reconsider the initial determination of nondisability, or otherwise causes a delay, the District Court ordered that the 90-day limit on the time from a reconsideration request to issuance of the notice of the result be tolled. App. to Pet. for Cert. 33a. Because the Secretary urged that it was frequently in the claimant's interest to delay, the court also tolled the time limit for any period of delay requested by the claimant or his representative. *Ibid.* Similarly, the District Court tolled the 90-day limit on the time from a request for a hearing to the provision of a hearing when the claimant or his representative either fails to provide information needed by the Administrative Law Judge (ALJ) for adjudication, requests a delay, fails to appear for the scheduled hearing, or otherwise causes delay. *Id.*, at 34a.

Finally, the remedy pertains only to the Secretary's statutory obligation to provide *hearings* within a reasonable time. The order places no time limit on the Secretary's issuance of decisions, although the plaintiffs, relying on the Social Security Act, the Administrative Procedure Act, 5 U. S. C. §§ 555(b),(e), 706(1), and the Constitution, included in their request for relief a plea that "a hearing decision be rendered promptly" after a hearing. App. 24. By its repeated references to decisions and overall processing time, the majority implies that the District Court tied the hands of ALJs, forcing them to evaluate complex disability claims in a race against the clock. The order we are reviewing simply does not speak to decisionmaking; it interprets and enforces only a claimant's right to a timely *hearing*.

In sum, the District Court's order was based on an extensive record of the actual operation of the disability program by the State of Vermont and the Secretary, and the plaintiff class members' experience in attempting to assert their stat-

utory right to timely hearings.   The order mirrored the Secretary's stated policy of holding hearings within 90 days of a request, a policy she was capable of implementing without additional resources.   The District Court created nine exceptions to the mandatory time limits, exceptions directly linked to the Secretary's responsibility to make accurate determinations of disability.   And the order placed no time limit on the rendering of decisions.   With this clearer understanding of the relief granted by the District Court, we turn to the question whether such an equitable remedy is precluded by law.

## II

### A

In the absence of a clear command to the contrary from Congress, federal courts have equitable power to issue injunctions in cases over which they have jurisdiction.   *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 398 (1946).   This Court has expressly rejected the arguments that the judicial review provision of the Social Security Act "does not encompass the equitable power to direct that the statute be implemented through procedures other than those authorized by the Secretary," and that class injunctive relief is not available under 42 U. S. C. § 405(g).   *Califano* v. *Yamasaki*, 442 U. S. 682, 705, and n. 17 (1979).   Although Congress has delegated to the Secretary "full power and authority to make rules and regulations and to establish procedures," 42 U. S. C. § 405(a), that discretion is limited by the requirement that procedures be consistent with the Social Security Act, and necessary or appropriate to carry out its provisions.   *Ibid.*   Courts may require the Secretary to comply with the statute.   A federal court thus is not precluded by statute from ordering injunctive relief when the record in a case supports the conclusions that the plaintiffs are entitled to relief and that the likelihood of irreparable harm renders an available remedy at law inadequate.

## B

The dominant rationale of the Court's opinion is that an inconclusive debate in Congress during the past decade regarding the wisdom of establishing *nationwide* time limits on the Secretary's review of disability applications clearly evinces the Legislature's hostility to the statewide remedy ordered by the District Court. The postenactment legislative history emphasized by the Secretary and the majority has little relevance to the task before us. If any legislative history were helpful, it would be the history of the statutory provision that first accorded claimants a right to review of adverse determinations and a "reasonable . . . opportunity for a hearing." Act of Aug. 10, 1939, ch. 666, § 201, 53 Stat. 1368.[5] That provision has remained intact for 45 years.

Although Congress has amended § 205(b) in various respects on seven occasions, it has repeatedly reenacted the "right to a hearing" provision without change or limitation,[6] and has done so over the past decade with a full awareness that courts were enjoining unreasonable delays as con-

---

[5] The legislative history of § 205(b) is sparse, but generally supports respondents' position. The bill embodying the "right to a hearing" provision was intended "to strengthen and extend the principles and objectives of the Social Security Act." H. R. Rep. No. 728, 76th Cong., 1st Sess., 5 (1939). The agency charged with implementation of the Act believed the timely provision of hearings to be "the essence of the task to be performed." Federal Security Agency, Social Security Board, Basic Provisions Adopted by the Social Security Board for the Hearing and Review of Claims (1940), reprinted in Attorney General's Committee on Administrative Procedure, Administrative Procedure in Government Agencies, S. Doc. No. 10, 77th Cong., 1st Sess., pt. 3, p. 37 (1941). The Social Security Board stated that all hearings should be held within 30 days of request. *Id.*, at 45.

[6] Act of Aug. 28, 1950, ch. 809, § 108(a), 64 Stat. 518; Act of Aug. 1, 1956, Pub. L. 880, § 111, 70 Stat. 831; Act of July 30, 1965, Pub. L. 89–97, § 308(d)(9), 79 Stat. 379; Act of Jan. 2, 1976, Pub. L. 94–202, § 4, 89 Stat. 1136; Act of June 9, 1980, Pub. L. 96–265, § 305(a), 94 Stat. 457; Act of Jan. 12, 1983, Pub. L. 97–455, § 4, 96 Stat. 2499; Social Security Amendments of 1983, Pub. L. 98–21, §§ 301(d)(1), 309(i)(1), 97 Stat. 111, 117.

trary to the statutory purpose and violative of the rights conferred on disabled persons by the Social Security Act. This affirmative action deserves acknowledgment and weight. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 379–382 (1982); *Cannon* v. *University of Chicago,* 441 U. S. 677, 696–698 (1979); *Lorillard* v. *Pons,* 434 U. S. 575, 580–581 (1978). The postenactment legislative history simply does not support the conclusion reached by the majority because Congress' failure itself to remedy the delay problem cannot be read to exclude judicial responses. Congress has long been aware of efforts by several federal courts to compel the Secretary to accelerate her review of adverse disability determinations,[7] and has not taken any action to curtail such judicial innovation.[8]

---

[7] See, *e. g.,* H. R. Conf. Rep. No. 96–944, p. 59 (1980) (Conference Report accompanying Social Security Disability Amendments of 1980, noting without criticism that in the absence of a statutory time limit on adjudication of claims, several District Courts had imposed such limits at the hearing level).

Cases in which federal courts presented with unreasonable delays by the Secretary have imposed deadlines include *Sharpe* v. *Harris,* 621 F. 2d 530 (CA2 1980) (affirming time limits in Supplemental Security Income (SSI) hearings, decisions, and payments to New York State class); *Blankenship* v. *Secretary of HEW,* 587 F. 2d 329 (CA6 1978), on remand, 532 F.Supp. 739 (WD Ky. 1982), aff'd in part, stayed in part, 722 F. 2d 1282 (1983) *(per curiam)* (Title II and SSI claimants' hearings must be held within 180 days; those whose benefits have been terminated have right to decision from Appeals Council within 90 days; order of interim payments after 180-day delay stayed pending decision in the present case), stayed, 465 U. S. 1301 (1984); *Caswell* v. *Califano,* 583 F. 2d 9 (CA1 1978) (90-day limit from request to hearing for Maine Title II claimants); *Barnett* v. *Califano,* 580 F. 2d 28 (CA2 1978) (order applicable to Vermont SSI disability claimants, requiring hearings in most cases within 90 days of request); *White* v. *Mathews,* 559 F. 2d 852 (CA2 1977) (Connecticut disability claimants entitled to hearing and final decision within 120 days; 1-year phase-in of time limit; interim payment of benefits ordered), cert. denied, 435 U. S. 908 (1978); *Chagnon* v. *Schweiker,* 560 F. Supp. 71 (Vt. 1982) (Secretary ordered to provide disability and SSI payments to those found eligible within 60 days after determination of eligibility by an ALJ or the Appeals Coun-

What insight can be gleaned from the recent history sup-
ports the proposition that the District Court's *statewide*
prospective injunction setting time limits for reconsideration

cil); *Crosby* v. *Social Security Administration*, 550 F. Supp. 1278 (Mass. 1982) (Title II and SSI disability claimants have right to a decision within 180 days of request for a hearing (plus time attributable to specified reasonable causes for delay) and to award of interim benefits if deadline not met), appeal pending, No. 83–1077 (CA1). But see *Wright* v. *Califano*, 587 F. 2d 345 (CA7 1978) (reversing order to phase in time limits for review of disputed old-age and survivors' benefits claims, finding delays not so unreasonable as to justify court's exercise of equitable power).

[8] The only congressional suggestion of disapproval of court-ordered timely hearings that the majority has cited, *ante*, at 114–115, and n. 25, when read in context, supports only the inference that Congress chose not to "assert its power to give the district courts more specific direction," *White* v. *Mathews, supra*, at 861. If the Committee's remarks are at all germane to our discussion, then it is surely relevant that the Committee reported favorably on a proposed amendment to the Social Security Act that would have limited courts' injunctive authority in remedying delay, an amendment that Congress chose *not* to enact. H. R. 6181, § 10, 97th Cong., 2d Sess. (1982). Moreover, in expressing its disapproval of the *Blankenship* decision, see *ante* at 115, and n. 25, the Committee appeared to distinguish that decision, which involved a nationwide remedial order, from six other court orders which "apply only in the areas under the jurisdiction of the court." H. R. Rep. No. 97–588, p. 19 (1982). Finally, the Committee's concern that strict time limits "could result in incorrect determinations because time was not available to obtain needed medical evidence or to reach well-reasoned decisions," *id.*, at 20, is accommodated in the present case by the tolling provisions in the District Court's order and by the absence of any time limits on the rendering of hearing decisions.

In fact, since the District Court's order, Congress can be said to have endorsed the courts' conclusion that claimants should not bear the entire burden of delay by the Secretary. The 97th Congress substantially enhanced the protection of persons, like respondents Day and Maurais, who have been receiving Title II benefits but whom the Secretary determines are no longer disabled within the meaning of the SSA. If they appeal the Secretary's initial determination, they may elect to continue to receive payments during the pendency of the appeal, subject to return of any overpayment. Act of Jan. 12, 1983, Pub. L. 97–455, § 2, 96 Stat. 2498, 42 U. S. C. § 423(g). The Senate Committee Report explained that "some emergency relief is warranted for workers who are having benefits terminated by State agencies and then—in more than half the cases appealed—

determinations and hearings, far from being inconsistent with "repeated congressional rejection of the imposition of mandatory deadlines on agency adjudication of disputed disability claims," *ante*, at 119, effectively accommodates Congress' concern that review of disputed disability determinations be both accurate and expeditious. While it is correct that Congress hitherto has not enacted a nation-wide standard in statutory form, that inaction is relevant to the equitable remedy under review only if statutory nation-wide time limits are functionally no different from time limits imposed by a court on the operations within one State. Clearly, they are not. A statutory response is inflexible, requires a concomitant commitment by Congress to provide the resources to enable the Secretary to comply with the standard across the Nation, and is difficult to amend in response to changing experience. A court-ordered timetable is a flexible response to a particular factual record. It can be narrowly tailored to accommodate both the Secretary's obligation and the claimants' rights within the framework of resources and practices in a defined jurisdiction. If new factual developments alter the equitable balance, a court can modify relief. See Fed. Rule Civ. Proc. 60(b)(5); *New York Assn. for Retarded Children, Inc.* v. *Carey*, 706 F. 2d 956, 967 (CA2), cert. denied, 464 U. S. 915 (1983).

Congress' discussion and inaction might be relevant if, in rejecting a statutory remedy, Congress also rejected the existence of the problem. If any theme emerges from the post-enactment legislative history, however, it is that delay is inconsistent with the Social Security Act, and imposition of

---

having their benefits reinstated by an ALJ." S. Rep. No. 97–648, p. 6 (1982). Although passed as an interim measure expiring in June 1984, the 98th Congress has moved to make continuation of benefits permanent. The Social Security Disability Benefits Reform Act of 1984, H. R. 3755, § 223(g), 98th Cong., 2d Sess. (1984), has passed the House and has been read twice in the Senate. See also Brief for the Alliance of Social Security Disability Recipients et al. as *Amici Curiae.*

deadlines would be consistent.[9]   Congress repeatedly suggested to the Secretary that she formulate standards and report back to Congress on the feasibility of time limits.[10]   The Secretary repeatedly assured Congress that administrative steps would reduce hearing delays to an acceptable level.[11]

[9] Had the Secretary adopted mandatory time limits pursuant to her rulemaking authority, and was now facing a challenge rather than bringing one, I have no doubt that she would be citing this same legislative history for the proposition that Congress thought time limits consistent with the Social Security Act.   Cf. *Heckler* v. *Campbell*, 461 U. S. 458 (1983).   In *Campbell*, the Court upheld the Secretary's reliance on medical-vocational guidelines, noting that since amending the Social Security Act to provide for disability benefits in 1954, Congress repeatedly suggested that the Secretary adopt rules defining the criteria for evaluating disability.   "While these sources do not establish the original congressional intent, they indicate that later Congresses perceived that regulations such as the guidelines would be consistent with the statute."   *Id.*, at 466, n. 10.   The same inferences are available to the Court in the present case.

[10] See, *e. g.*, Pub. L. 96–265, § 308, 94 Stat. 458, note following 42 U. S. C. § 401.   The Social Security Disability Amendments of 1980 required the Secretary to report to Congress "recommending the establishment of appropriate time limitations governing decisions on claims for benefits under title II of the Social Security Act . . . tak[ing] into account both the need for expeditious processing . . . and the need to assure that all such claims will be thoroughly considered and accurately determined."

[11] See, *e. g.*, H. R. Rep. No. 94–679, p. 2 (1975) (relying on agency's estimate that a limited reform bill could reduce hearing backlog by 3,000 cases a month "so that in 18 months cases can be adjudicated within 90 days"); S. Rep. No. 94–550, p. 3 (1975) (same); Delays in Social Security Appeals, Hearings before Subcommittee on Social Security of the House Committee on Ways and Means, 94th Cong., 1st Sess., 74 (1975) (assurances of SSA Commissioner Cardwell that backlog could be brought under control and hearings scheduled within 90 days of request by June 1977).

The Secretary has given similar assurances in litigating challenges to delays in the review process.   See, *e. g.*, *Sharpe* v. *Harris*, 621 F. 2d, at 531; *White* v. *Mathews*, 434 F. Supp. 1252, 1256–1257 (Conn. 1976), aff'd, 559 F. 2d 852 (CA2 1977); *Crosby* v. *Social Security Administration*, *supra*, at 1282.   In the present case, the Secretary opposed the plaintiffs' motion for summary judgment on the issue of liability in part on the ground that she was ready to issue regulations setting 90-day hearing deadlines, and the court should therefore abstain.   App. to Pet. for Cert. 18a–19a.

In fact, albeit under court pressure, the Secretary published proposed rules in the Federal Register in 1980, setting nationwide time limits on the review process, and in 1981 characterized revised rules as "realistic [time limits], which we plan to achieve, and for which we expect to be held accountable," and as "time limits which can and should be achieved in the operation of the adjudicatory system as it currently exists," without "significantly greater resources" or "decreases in decisional accuracy." [12]

In sum, for several independent reasons, Congress' reluctance to establish nationwide time limits within which the Secretary must resolve disputed disability claims does not support the inference that Congress disapproves the exercise by federal courts of their equitable power to ensure that disability claimants in particular jurisdictions are not deprived of their statutory entitlements. If any aspect of the post-enactment legislative history of § 205(b) of the Social Security

---

[12] Subcommittee on Social Security of the House Committee on Ways and Means, Status of the Disability Insurance Program, 97th Cong., 1st Sess., 45–46 (Comm. Print 1981) (hereinafter 1981 Comm. Print) (response of Social Security Commissioner Driver to Rep. Pickle). The proposed rulemaking set a 90-day limit on hearings, subject to exceptions very similar to the nine exceptions in the present case, and required that hearing decisions issue within 30 days after a hearing is held and the record closed. 45 Fed. Reg. 12838–12839 (1980). Reporting to Congress 10 months later, the Secretary recommended 150 days from application for reconsideration to decision, and 165 days from request for a hearing to issuing a decision, because experience had indicated that, nationwide, the agency could provide hearings within 90 days only in about 70% of the cases, and issue decisions within 30 days in about 80% of the cases. U. S. Dept. of Health and Human Services, Report to Congress, Implementation of Section 308, Public Law 96–265 (Oct. 21, 1980), reprinted in 1981 Comm. Print, at 43.

Whether Congress might have acted affirmatively but for the Secretary's assurances is a matter for conjecture, but it is as valid an inference as the majority's inference that Congress' failure to enact nationwide deadlines, or to order the Secretary to do so pursuant to her rulemaking authority, is an affirmative rejection of the proposition that a claimant's § 205(b) right to a timely hearing should be effectuated through promulgation of time limits.

Act bears directly on the problem before us, it is the fact that Congress has repeatedly reenacted the provision with the awareness that the courts had been ordering the Secretary to comply with time limits when necessary to prevent unreasonable delays in providing reconsiderations and hearings. There is thus no basis for the majority's conclusion that the equitable remedy ordered by the District Court in this case is barred by implication.

## III

Because the District Court's remedy is barred neither by an explicit statutory restriction, nor by implication, it should be upheld unless it constitutes an abuse of discretion. The abuse-of-discretion standard is not toothless in this context. We have cautioned the lower federal courts against "engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 525 (1978). Congress has mandated hearings on disputed disability determinations, but has committed implementation of the review and hearing process to the Secretary. I agree that the Secretary has substantial discretion, with which the courts should not interfere, in determining how to comply with her statutory obligations.

These general principles of judicial deference to agency discretion in devising procedures to achieve legislatively defined objectives are reinforced by some pragmatic considerations. Excepting, of course, those cases where denial of benefits rises to the level of violations of due process, I would agree that the problem of delay may at times not be susceptible to judicial solution. For example, when crowded administrative dockets are directly linked to limited congressional appropriations and lack of personnel, the only solution may lie in the hands of Congress. Similarly, when delays are directly linked to the fairness and accuracy of the adjudicatory process—for example, when delays result from the need to gather additional medical evidence relevant to the core issue

of disability—only the agency charged with determining disability within the terms of the statute may be able to alleviate the problem.

On the other hand, the Secretary's discretion cannot be boundless, and courts must determine whether her actions are sufficient to effectuate the individual entitlements created by Congress. Therefore, many situations quite appropriately call for judicial intervention. For example, when a standard for processing similar cases can be established from the agency's own records, lengthy delays beyond that norm may indicate a dilatory agency response inconsistent with the statutory directive to provide a claimant a timely hearing. Similarly, if the agency's records disclose specific inefficiencies or inactivity that bear no definable relationship to resource constraints or the need to ensure accurate decision-making, courts would be remiss in deferring to the agency's unreasonably dilatory processing of claimants' requests for review.

The record in the present case supports the conclusion that the District Court tailored its remedy to respond to causes of delay that are properly susceptible to judicial scrutiny and solution. The District Court considered record evidence of the agency's standard for processing disability hearing requests. The Secretary offered the 90-day figure as her established policy for scheduling hearings. Prior to the District Court's order, she provided hearings within that time in only 57% of the cases, with a 2- to 9-month range of delay. App. to Pet. for Cert. 15a. Yet the Secretary did not complain that she was prevented from complying with her own policy because of lack of resources. To the contrary, she stated that she had the proper complement of ALJs needed to conduct Title II disability hearings in Vermont.[18] There-

---

[18] The Secretary hypothesized four categories of reasons for not scheduling hearings within 90 days: lack of claimant cooperation in providing necessary information; delay in response from medical sources cited by the

fore, when the District Court ordered relief, no record evidence suggested that the Secretary would have difficulty complying.

When the District Court turned its attention to delays in the reconsideration process, it based its order on 77 representative case summaries provided by the Secretary. Again, the Secretary's own standard was disposition in less than 90 days. The court accepted her description of the "complex and time-consuming" reconsideration process, which encompasses a *de novo* review of the existing record and any necessary supplemental evidence. The court therefore allowed a "reasonable time for locating the claim folder, forwarding it to the appropriate agency, obtaining and assessing additional evidence, and generating notices." *Id.*, at 29a. In each of the 27 cases in which reconsideration took longer than 90 days, however, the court found "periods of unexplained delay, not directly attributable to necessary steps in the reconsideration process." *Id.*, at 28a. It further found that, "when the *explained* delays in the case summaries are subtracted, most, if not all, of the cases could have been completed within 90 days." *Ibid.* (emphasis in original).

Thus, far from imposing an arbitrary deadline on an embattled agency, the court looked first to the standard adopted by the agency itself for meeting its statutory obligation to provide timely hearings within the constraints of the resources available to it. Further, the court explicitly rejected the respondents' contentions that delays beyond a specific number of days violated the statute, and that the mere passage of time justified the extraordinary relief sought by the plaintiff

---

claimant; logistical and scheduling problems due to distant travel; and agency assistance to claimants in obtaining complex and specialized medical development. Answers to Interrogatories Nos. 23, 24, App. 52. The Secretary provided no evidence that any of these reasons caused delays in scheduling the class representatives' hearings.

class.  App. 99–100.  Rather, the court framed the question as the *reasonableness* of the delays.[14]  The court's demands to the parties over a 3-year period to produce a record sufficient to answer the question presented[15] evinces its reluctance to substitute its own sense of proper agency procedure for that of the Secretary.

The court's remedy similarly reflects its sensitivity to the special difficulties of administering the massive Social Security system, and to the challenges the Secretary faces in meeting the administrative goals of accuracy and promptness.  Cf. *Califano* v. *Boles*, 443 U. S. 282, 285 (1979).  By exempting from its order circumstances in which the agency needed to gather medical evidence and reports, the court responded to the Secretary's concern that she not be forced to sacrifice accuracy for the sake of providing more expeditious hearings.  By exempting circumstances in which the claimant failed to cooperate in the process or contributed to the delay, the court accommodated the Secretary's concern that

---

[14] Midway through the litigation, the court found the record "devoid of information concerning the reasons why the delays occurred.  The plaintiffs have recognized that there will be times when the delay is either requested by the recipients to enable them to provide additional information or is caused by the recipients' failure to cooperate with the Secretary's requests.  Similarly, the Secretary has acknowledged that delays may have been the result of increased case-load or insufficient staffing.  It is clear, then, that the record is inconclusive with respect to the reasonableness of the delays.  And since the reasonableness of the delays is the prime question before the court, the motions for summary judgment must be denied."  Memorandum Decision of July 14, 1980, App. 99–100.  Only after continued discovery did the court rule that delays beyond 90 days were unreasonable.  App. to Pet. for Cert. 28a–29a.

[15] In response to plaintiffs' third request for interrogatories, seeking the data demanded by Judge Holden, the Secretary chose to submit 77 randomly selected disability reconsideration cases selected by her from a total of 453 reconsiderations performed between October 1, 1977, and January 31, 1980.  Defendant's Answers to Third Interrogatories, Mar. 30, 1981, App. 105–149, 193–195.

she be permitted the degree of flexibility required in the best interests of the claimants as well as the agency. And, of course, a significant accommodation to the Secretary's concern for accurate determinations in the court's order is its total exemption of the decisionmaking, as opposed to the information-gathering, process. There is no time limit whatsoever placed on ALJs' deliberations and issuance of decisions. ALJs have sufficient time to deliberate to ensure accurate decisions, and to schedule new consultative examinations if additional evidence is required.

Finally, the consequences of the injunction are a further indication of the reasonableness of the court's interpretation of the statutory mandate. Cf. *Califano* v. *Yamasaki*, 442 U. S., at 697. During the 28 months in which a hearing injunction has been in effect, the Secretary has met the standard in all but one case, without additional allocation of resources and subsequent adverse impact elsewhere in the Social Security Title II disability claims system. Brief for Respondents 30, n. 32; Tr. of Oral Arg. 33, 51. This record suggests both that the injunction has not had the slightest impact on the Secretary's nationwide management of the disability review process, and that the injunction has had the desired effect of enforcing disabled Vermonters' rights to timely hearings.

A remedy manifestly attentive to the Secretary's practical and policy concerns should not be held to be an abuse of discretion. The District Court's order applied only to delay that was found as fact *not* to be the "direct and foreseeable consequenc[e] . . . of the conscientious implementation of the Social Security Act." Brief for Petitioner 33. Given the additional record evidence that 21.3% of the initial determinations that a claimant was not disabled within the meaning of the Social Security Act were found on reconsideration to be erroneous, and 56.2% of the decisions were reversed at the hearing stage, App. 53, the court properly responded to the

special urgency of enjoining unreasonable barriers to claimants' receipt of benefits mandated by Congress.[16]

## IV

In summary, the relief ordered in this case was founded on three correct premises. First, a federal court has a responsibility to enforce the right to a hearing expressly granted in the Social Security Act. The Act requires that such a hearing be timely. Second, the mere length of processing times does not constitute an adequate basis for classwide injunctive relief, for the delay may be attributable to reasons related to the Secretary's mandate to make accurate as well as expeditious disability determinations within the constraints of the resources at her disposal. However, if the causes of delay are unrelated to the adjudicative process, the delay is unreasonable. Third, the unreasonableness of delay is of magnified significance when the record establishes that more than half of the Vermont claimants who pursue their right to an administrative hearing are found to have been disabled and to be entitled to the payments initially denied by the Secretary. By definition, a disabled person has been unable "to engage in *any* substantial gainful activity," 42 U. S. C. § 423(d)(1)(A) (emphasis supplied), and deprivation of income works hardships that cannot adequately be compensated by

---

[16] The significance we place on the reversal rate must be tempered by the fact that the administrative appeals process permits introduction of additional evidence of disability at each stage. Therefore, a denial of disability status at one stage could well have been "correct" based on the evidence available to the decisionmaker. Cf. *Mathews* v. *Eldridge,* 424 U. S. 319, 346–347 (1976). Nonetheless, the fact remains that hundreds of disabled Vermonters endure grave hardship because they do not receive entitlements during the delayed review process. The Government has an obligation to the rightful beneficiaries of its insurance program. Members of the plaintiff class were once workers, paying into the Social Security system for the required number of years to earn entitlement to income when disabling illness or accident keeps them from the workplace.

retroactive payments following a delayed decision in his or her favor. Therefore, in the face of irreparable harm to the plaintiff class, which has established a statutory right to relief, a federal court properly may order injunctive relief, and properly did so in the present case.

I dissent.