The STATE OF NEW YORK; Cesar Perales, as Commissioner of the New York State Department of Social Services; the City of New York; the County of Suffolk; Peter F. Cohalan, as County Executive of the County of Suffolk; Anita Romero, as Commissioner of the Suffolk County Department of Social Services; and Walthon White, Haydee Guzman, Anibal Villanueva, Rafael Rivera, Gladys Dominguez, Hector Muniz, Luis Diaz, Cathryn Gibbons, Maria Gonzalez, Jorge Perez, Edwarda Rivera, Herminia Gonzalez, all others similarly situated, Plaintiffs–Appellees, Cross–Appellants,

v.

Louis W. SULLIVAN, M.D., as Secretary of the United States Department of Health and Human Services; Docas Hardy, as Commissioner of the Social Security Administration; and the United States Department of Health and Human Services, Defendants–Appellants, Cross–Appellees.

Nos. 1346, 1520, Dockets 90–6044, 90–6092.

United States Court of Appeals, Second Circuit.

Argued May 31, 1990.

Decided June 27, 1990.

912

Evelyn M. Tenenbaum, Asst. Atty. Gen., State of N.Y., New York City (Robert Abrams, Atty. Gen., State of N.Y., Yvonne Powe, Asst. Atty. Gen., Neil Corwin, William J. Thom, Asst. Corp. Counsel of New York City, Victor A. Kovner, Corp. Counsel, New York City, Joyce D. Long, Asst. Suffolk County Atty., E. Thomas Boyle, Suffolk County Atty., Hauppage, N.Y., of counsel), for Governmental plaintiffs-appellees, cross-appellants.

David S. Udell, Legal Services for the Elderly, New York City (Toby Golick, Jonathan A. Weiss, Legal Services for the Elderly, Wayne G. Hawley, Jill A. Boskey, MFY Legal Services, New York City, Jill A. Siegal, Kenneth J. Barnes, Bronx Legal Services, Bronx, N.Y., Lewis Golinker, Legal Services of Central New York, Syracuse, N.Y., of counsel), for individual plaintiffs and plaintiff class-appellees-cross-appellants.

Diogenes P. Kekatos, Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Edward T. Ferguson, III, Asst. U.S. Atty., New York City, of counsel), for defendants-appellants, cross-appellees.

David Orentlicher, Kirk B. Johnson, Edward B. Hirshfeld, American Medical Ass'n and American College of Cardiology, Chicago, Ill., as amici curiae.

Before KAUFMAN, KEARSE and MINER, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

As the agency charged with administering the Social Security Act (the "Act"), the Department of Health and Human Services ("HHS") has a vital responsibility to evaluate the claims of those with debilitating heart diseases fairly and accurately. This is especially the case when afflictions disable people from working and adverse agency decisions threaten claimants and their families with indigency.

This action challenges the policies used by the Secretary of the Department of Health and Human Services ("the Secretary") to parcel out disability benefits to applicants claiming to suffer from ischemic heart disease. A December 4, 1989 Order and Judgment implemented an earlier decision, *State of New York v. Bowen*, 655 F.Supp. 136 (S.D.N.Y.1987), in which Judge Carter, in a carefully reasoned opinion, granted summary judgment and invalidated the Secretary's policy of relying exclusively on treadmill exercise test results when evaluating disability claims for cardiovascular disease as contravening the Act. The district court ordered the readjudication of unfavorable disability determinations received by members of a subclass that was certified earlier. *State of New York v. Heckler*, 105 F.R.D. 118 (S.D.N.Y. 1985). The Secretary appeals from these orders and judgment. The appellee subclass of claimants and the State of New York cross appeal as to the scope of relief awarded. We conclude that summary judgment was appropriately granted and affirm the decision of the court below.

## I. BACKGROUND

This case centers on the procedures used to evaluate the functional capacity of claimants with ischemic heart disease ("ischemia"). Administration of the Act in this area affects large numbers of people. More than sixty percent of all individuals with heart disorders suffer from ischemic heart disease, an affliction caused by narrowing of the arteries, usually due to coronary atherosclerosis. Atherosclerosis is the pathological process whereby deposits of cholesterol and other substances narrow and obstruct the artery walls of the heart. When the coronary arteries are blocked by atherosclerosis, not enough blood, and therefore not enough oxygen, reaches the heart muscle. Individuals with ischemic heart disease typically suffer chest pain ("angina") upon exertion. *See* E. Braunwald, *Heart Disease: A Textbook of Cardiovascular Medicine* 1191, 1314 (3d ed. 1988).

Pursuant to the Act, the federal government provides benefits to disabled persons under two distinct programs administered by the Social Security Administration ("SSA"). Title II of the Act, through the Social Security Disability Insurance program ("SSDI"), provides for the payment of insurance benefits to persons who have previously contributed to the program and suffer from a physical or mental disability, and Title XVI of the Act, through the Supplemental Security Income program ("SSI"), provides for the payment of disability benefits to indigent persons.

Initial disability determinations are generally made by a state agency acting under the authority and control of the Secretary. 42 U.S.C. §§ 421(a), 1383b(a). In New York, the Office of Disability Determinations ("ODD") of the New York State Department of Social Services assesses requests for benefits. ODD's resolution of claims must be made in accordance with the Act and the standards and criteria contained in the relevant regulations and other written guidelines of the Secretary. Disappointed claimants may seek federal administrative review by the SSA. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); *see Bowen v. City of New York*, 476 U.S. 467, 471–72, 106 S.Ct. 2022, 2025–26, 90 L.Ed.2d 462 (1986). Upon exhaustion of administrative remedies, the claimant may seek judicial review in federal district court. 42 U.S.C. § 405(g).

The Secretary has established a five-step sequential evaluation process for determining entitlement to benefits. The first step in the process requires the Secretary to ascertain whether the claimant is currently engaged in "substantial gainful activity." If so, benefits are denied. If the applicant is not engaged in such activity, the second step requires a decision whether the claimant's medical condition or impairment is "severe," *i.e.*, one that significantly limits his ability to work. If the impairment is found to be "not severe," benefits are denied.

If the impairment is severe, step three requires a determination of whether the damage is of sufficient gravity to meet or equal the definitions found in the Listing of Impairments (the "Listings"). *See* 20 C.F.R. Part 404, Subpt. P, App. 1 (1987). The Listings is a catalog of physical signs, laboratory findings and clinical symptoms that are deemed to be evidence of impairments which are so severe that their presence alone conclusively establishes disability. If the applicant meets or equals the Listings, he or she is considered disabled. If, however, a claimant has a severe impairment that is not considered *per se* disabling under the Listings, step four compels the Secretary to ascertain his residual functional capacity ("RFC"), a measure of employment capabilities. If he is able to meet the physical and mental demands of his prior work, benefits are denied. If the applicant is unable to perform his past work, he is then evaluated at the fifth step in the process, which requires a finding of whether, given his functional ability (RFC), age, education and past work experience, he could perform other jobs that exist in the national economy. If the claimant is found unable to do such work, benefits are awarded. *See generally*, 20 C.F.R. §§ 404.1520, 404.1521, 416.920, 416.921, 416.965.

## A. *Medical Aspects*

In this appeal the State of New York and class representatives challenge the Secretary's reliance on certain diagnostic tests used in the evaluation process at steps 3, 4 and 5. Specifically, they challenge the Secretary's heavy reliance on treadmill exercise tests to determine ability to work. These tests are performed by requiring an individual to walk on a treadmill or to pedal on a cycle while electrocardiogram ("EKG") responses are recorded. During the procedure the treadmill's speed and gradient are progressively escalated, placing increasingly greater oxygen demands on the patient. Abnormalities in the EKG response indicate ischemia.

Evidence presented below established that the treadmill test, while recommended by many medical experts as a good diagnostic tool, results in misdiagnosis of ischemic heart disease on more than one third of the occasions. An individual who does not show signs of heart disease during a treadmill test may still be severely disabled from ischemia. False assessments may occur because treadmill testing does not consider the full range of stresses and exertions that arise at the workplace or in daily living. For example, the test does not account for demands placed on the heart by heat, cold, humidity, pollution, altitude, psychological pressures and physical efforts that are sudden or prolonged. *See* American College of Cardiology, *Insurability and Employability of the Patient with Ischemic Heart Disease*, 14 J.Amer.Coll. Card. 1003, 1033 (1989).

In certain circumstances, other widely used procedures, including nuclear tests (the exercise thallium test and the equilibrium radionuclide angiogram) and angiography, are more reliable than the treadmill test in measuring the severity of ischemic heart disease. The exercise thallium test produces an image of the heart muscle after injecting small amounts of a radioactive substance into the bloodstream and using a nuclear camera to photograph changes. The equilibrium radionuclide angiogram creates a computer-synthesized image of the heart following injection of a radio-isotope. In angiography, X-ray pictures are taken after inserting a catheter at the origin of the coronary artery and then injecting an X-ray dye into the catheter's opening, producing detailed views of the heart's internal dimensions.

At step 3, the Listings provide for various medical tests by which a claimant may establish a cardiovascular disability. The Secretary sets forth guidelines in Social Security Rulings, internal directives and instructions issued to state agencies, for resolving whether an impairment "meets or equals" the Listings. When a treadmill test is available, either from a treating physician's file or because SSA required the test, and ischemia is the *only* ailment alleged, the Listings dictate that the results of the treadmill test control the analysis to the exclusion of all other medical findings, including the opinions of the treating physician and other diagnostic tests. *See* Listings 4.04 A.

Additionally, if the Secretary concludes that a claimant's medical condition does not meet or equal the Listings so as to conclusively establish disability, steps 4 and 5 of the procedure require the Secretary to consider the claimant's RFC—that range of activities that he is able to perform in spite of his impairment. Treadmill tests continue to greatly influence the conclusions reached at these stages. *See State of New York v. Bowen*, 655 F.Supp. at 139–40. Specifically, the Secretary's guidelines correlate EKG findings from treadmill tests with the ability to perform work at given levels of exertion. This correlation is then used to establish whether the claimant is able to engage in heavy, medium or light work. Occasionally, the results of these tests wrongly indicate that an applicant does not have ischemic heart disease. Even then, the treadmill tests are considered to the exclusion of all other relevant evidence. *Id.* at 144.

## B. *Class Certification*

The individual plaintiffs were certified as a class pursuant to Rule 23(a) Fed.R.Civ.P. The class consisted of:

All New York State residents with cardiovascular impairments whose applications or eligibility for SSDI or SSI disability benefits have been or will be denied or terminated by the application of *per se* denial rules on or after June 1, 1980.

*State of New York*, 105 F.R.D. at 122. In addition to the general class of all New Yorkers with cardiovascular impairments, Judge Carter certified a subclass of individuals who had specific heart ailments, including ischemia. *Id.*

The district court included within this subclass applicants who had not appealed from adverse decisions within sixty days and those who had not fully exhausted their administrative remedies as required by 42 U.S.C. § 405(g). The court reasoned that the Secretary's failure to publish part of the disputed policy in the Federal Register was a sufficiently serious procedural irregularity to justify equitable tolling of the sixty-day limitations period. Judicial waiver of the exhaustion of remedies requirement was deemed appropriate because the challenges to the Secretary's policies were collateral to the merits of the plaintiffs' individual claims, individual appeals were futile given the illegal policy, and failure to hear the claims would cause the plaintiffs irreparable harm through the denial of benefits. *See Bowen v. City of New York*, 476 U.S. at 483, 106 S.Ct. at 2031.

### C. *Cross Appeal*

In his December 4 Order, Judge Carter severely limited the scope of retroactive relief. The district court judgment did not require readjudication of claims that were denied at step 2 of the evaluation process because the treadmill test indicated that the claimants' condition was "not severe." The district court also declined to award interim relief; individuals were required to readjudicate their claims to receive retroactive benefits. Finally, the court only extended relief to those subclass members who had appealed their individual cases or reapplied for benefits during the pendency of this class action.

## II. DISCUSSION

■ The primary issue before us is whether the district court properly found that the Secretary's policies for evaluating the functional abilities of individuals suffering from heart disease presented no triable issue of fact. Fed.R.Civ.P. 56(c). In resolving this matter, a court's responsibility is to assess whether there are any material factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

In this case, disagreement centers on whether the Secretary relied exclusively on treadmill tests to determine disability benefits for claimants with ischemic heart disease. In his brief, the Secretary describes only the three limited circumstances in which the treadmill tests are not used as the sole basis for determining disability. As the district court aptly observed, rather than coming forward with specific facts to substantiate his version of the policy, the Secretary avoids challenging the damning deposition testimony of his own medical experts and instead mounts a defense based almost entirely on the rules themselves which are equivocal at best. *State of New York*, 655 F.Supp. at 145. After the smoke has cleared, one significant issue as to which there is no genuine dispute remains: the Secretary relies on the treadmill test to the exclusion of all other evidence when an applicant alleges maladies arising only from ischemic heart disease, and when a treadmill exercise test exists with which to determine an applicant's functional capabilities.

Although there was no real factual dispute over this question, we must consider whether the Secretary's decision to rely exclusively on treadmill tests nevertheless deserves deference from the courts. At the outset we note that the Act directs the Secretary to "adopt reasonable and proper rules and regulations to regulate and pro-

vide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same" in disability cases. 42 U.S.C. § 405(a).

Congress has expressly delegated substantive rulemaking authority to the Secretary and thus "has 'conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Social Security] Act.' " *Heckler v. Campbell*, 461 U.S. 458, 466, 103 S.Ct. 1952, 1956, 76 L.Ed.2d 66 (1983) (quoting *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 2639, 69 L.Ed.2d 460 (1981)). Because of this rather extensive legislative grant of authority, this Court must give the Secretary's regulations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). It is not the role of courts to substitute what they perceive as sound public policy for the Secretary's judgment.

Bolstered by these sweeping pronouncements, the Secretary defends his policy as a valid exercise of his considerable discretion in implementing the Act. It has not been argued that the guidelines are arbitrary or capricious—the regulations are rationally related to determining the functional disability of an ischemic heart disease claimant, have received substantial medical support from health professionals, and are the product of agency expertise. Accordingly, the Secretary argues, this Court must allow him to implement the Act as he sees fit.

However, the need for deference ends when the agency clearly transcends the limits established by Congress. Courts are not bound to respect an agency's decision which fails to acquiesce in judicial precedent or ignores statutory commands. Since Congress left no doubt that individualized treatment of disability claims is the rule,[1] sole reliance on the treadmill test results to the exclusion of other available relevant evidence clearly violates Congress's requirement of particularized treatment and significant input from treating physicians. *See Sullivan v. Zebley*, — U.S. ——, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); *Heckler v. Campbell*, 461 U.S. at 462 n. 5, 467, 103 S.Ct. at 1954–55 n. 5, 1957.

Analysis of nuclear tests and angiography readings, in conjunction with patient complaints and histories, helps to best identify individuals with a high probability of incapacitation although a treadmill test indicates employability. *See* V. Groelicher, *Exercise Testing and Training*, 145–50 (1983). When these alternative tests have been performed prior to an application for benefits, consideration of their results and the treating physician's recommendations, should, in light of current teaching on all the factors that play a part in the diagnosis of ischemic heart disease, vastly reduce the number of wrongful denials and terminations. In sum, the arbitrary results that flow from the failure to consider other available relevant evidence at steps 3, 4 and 5 are inconsistent with the personalized approach to disability adjudications required by the Social Security Act.

---

1. The language of the Act makes clear Congress's intent for individualized consideration of claims. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The 1984 amendments to the Act amplified this intent. They provide that the Secretary, when making disability determinations:

> shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making any determination the Secretary shall make every reasonable effort to obtain from the individual's treating physician ... all medical evidence,

> including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.

42 U.S.C. § 423(d)(5)(B). *See also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Although the amendments only apply to those subclass members for whom the Secretary made or will make disability determinations on or after October 9, 1984, they merely expand upon the basic principle applicable to all subclass members since the Act has called for "individualized determinations based on evidence adduced at a hearing," *Heckler*, 461 U.S. at 467, 103 S.Ct. at 1957, well before the recent amendments. *See State of New York v. Bowen*, 655 F.Supp. at 143.

## A. *Equitable Tolling*

■ In addition to disputing the appropriateness of summary judgment, the Secretary challenges the district court's decision to certify the subclass of claimants who, during the period running from June 1, 1980 through June 10, 1983, allowed their disability claims to lapse by not appealing. The Secretary claims that it was an abuse of discretion to equitably toll the requirement under 42 U.S.C. § 405(g) that claims be presented in the district court within sixty days of the Secretary's final decision. HHS contends that equitable tolling is permissible only when the party against whom it is asserted has engaged in some egregious affirmative misconduct. However, the Secretary's contentions are not persuasive. *See City of New York*, 476 U.S. at 480–82, 106 S.Ct. at 2030–31.

The sixty-day appeal requirement has been found to be a statute of limitations and not a jurisdictional condition. Equitable tolling of the limitations period found in Section 405(g) is not infrequently appropriate, as Congress intended to be "unusually protective" of claimants in this area. *Id.* at 480, 106 S.Ct. at 2030 (quoting *Heckler v. Day*, 467 U.S. 104, 106, 104 S.Ct. 2249, 2250, 81 L.Ed.2d 88 (1984)). While the decision whether to extend the period of review is usually left to the Secretary, cases occasionally arise where the equities in favor of tolling are "so great that deference to the agency's judgment is inappropriate." *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976). For example, equitable tolling is in order when government misconduct keeps plaintiffs from appreciating the scope of their rights. *City of New York*, 476 U.S. at 481, 106 S.Ct. at 2030; *Bailey v. Sullivan*, 885 F.2d 52, 64 (3d Cir.1989).

These principles clearly support the court's decision to toll the sixty-day period in this case. Indeed, prior to 1983 none of the Secretary's public pronouncements gave notice of the treadmill exercise test policies. Social Security Ruling 82–51 which outlined the Secretary's treadmill policy was not issued until January, 1983. HHS's policies were available only in memoranda which generally are not accessible to the public.

Even more significant was the Secretary's failure to publish the *per se* rules in the Federal Register. Failure to formally publish the cardiac impairment policy prevented wide-spread dissemination of that procedure. Plaintiffs therefore lacked the ability to know of the *per se* rules and were entitled to presume that their Government's determination of ineligibility was the considered judgment of an agency faithfully administering the law. *City of New York v. Heckler*, 742 F.2d 729, 738 (2d Cir.1984), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). This is not a case like *Pittston Coal Group v. Sebben*, 488 U.S. 105, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988), where agency action was taken pursuant to regulations that were published for all to see. Accordingly, Judge Carter was well within his discretion to equitably toll the sixty-day limitations period.

## B. *Exhaustion of Administrative Remedies*

The Secretary also contends that the district court erred by including in the subclass of claimants those who failed to exhaust their administrative remedies as required by Section 405(g). The exhaustion requirement derives from the "final decision" rule. *Id.* It consists of two elements: one which can be waived and the other which cannot. The non-waivable jurisdictional component requires that an applicant present a claim for benefits, while the waivable element mandates full exhaustion of available administrative remedies prior to seeking judicial review. *City of New York*, 476 U.S. at 482–85, 106 S.Ct. at 2031–32; *Mathews*, 424 U.S. at 328–30, 96 S.Ct. at 899–900. No jurisdictional problem is raised here by the presentment requirement since all class members initially applied for benefits. *State of New York*, 105 F.R.D. at 122. More complex is the propriety of waiver.

■ A court may waive the need to exhaust administrative remedies under appropriate circumstances. *Heckler v. Ringer,*

466 U.S. 602, 617–19, 104 S.Ct. 2013, 2022–24, 80 L.Ed.2d 622 (1984); *Mathews*, 424 U.S. at 330–32, 96 S.Ct. at 900–01. Waiver may be invoked when the following circumstances are present: the challenge is collateral to the demand for benefits, the exhaustion of remedies would be futile, and enforcement of the exhaustion requirement would cause the claimants irreparable injury. *City of New York v. Heckler*, 742 F.2d 729, 736 (2d Cir.1984), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). No one element is critical to the resolution of the issue; rather, a more general approach, balancing the competing considerations to arrive at a just result, is in order. *Id.*

■ Waiver here was appropriate. The issue raised by the subclass was "entirely collateral to [its] substantive claim of entitlement." *Mathews*, 424 U.S. at 330, 96 S.Ct. at 900. The basis for the claim was one of procedure since the class members neither sought nor were awarded benefits in the district court, but rather, challenged the Secretary's failure to follow the applicable statutory mandate. *City of New York*, 476 U.S. at 483, 485, 106 S.Ct. at 2031, 2032. Additionally, exhaustion of administrative remedies would have been a pointless exercise. *City of New York v. Heckler*, 742 F.2d at 737. Although exhaustion may have resulted in some individual members receiving benefits, the procedural right that the claimants sought to obtain, personalized determinations, could not have been vindicated by individual eligibility decisions. Finally, a colorable claim of irreparable harm was presented. Denial of benefits potentially subjected claimants to deteriorating health, and possibly even to death. We have been instructed that courts "should be especially sensitive to this kind of harm where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place," *City of New York*, 476 U.S. at 484, 106 S.Ct. at 2032. Because all three elements were present, waiver was within the court's discretion.

C. *The Cross Appeal*

■ In their cross appeal, the appellees contend that the district court's order improperly foreclosed relief to several categories of claimants and must be modified. A district court's remedial orders are reviewed under the deferential abuse of discretion standard. *Bennett v. White*, 865 F.2d 1395, 1402 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989). Accordingly, appellate review of the district court's order is narrow. We dispose of these contentions, upholding the lower court's exercise of discretion.

■ Cross-appellants contend that the district court erroneously failed to extend relief to claimants who were denied benefits at step 2 of the sequential evaluation. It will be recalled that at this stage the Secretary decides whether the alleged impairments are severe, and immediately dismisses claims that are "not severe." While the district court granted prospective relief prohibiting exclusive reliance on the treadmill test results at step 2, the court did not extend this relief retroactively. This limitation was permissible.

As the district court made clear in its opinion, step 2 of the adjudication process was not at issue in this litigation. Since Judge Carter expressed no view on the step 2 issue, the order did not encompass claims that were previously denied as "not severe." Further, Judge Carter's dismissal without prejudice of all claims for which relief was not granted alleviates concerns about eventual compensation for those wrongfully denied benefits at that stage.

Moreover, the court declined to immediately restore benefits to subclass members whose aid was terminated. The district court ordered, instead, that benefit reinstatement await individualized reassessment of disability claims. The court found that eventual full payment for wrongfully terminated applications provided claimants with adequate relief. Although it was within the court's remedial power to award interim benefits prior to administrative readjudication of claims, the district court

was acting well within its power when it denied the relief.

■ Finally, the class representatives argue that the district court erred in limiting the full reopening of claims to those subclass members as to whom benefits were terminated or who appealed adverse determinations. The judgment, however, provides for only "partial reopening" of the applications of those subclass members who did not appeal their individual cases or reapply for benefits during the pendency of the class action. Consequently, when readjudicating these applications on remand, the Secretary will only consider evidence that pertains to the time period ending with the date of the initial unlawful decision that established subclass membership. Full reopenings, where the Secretary may consider all relevant evidence to the present, are extended only to those subclass members who, despite the existence of the class action, continued to file individual appeals or reapplications, while the class action was pending.

As a result of the remedial order, subclass members who exclusively relied on the lawsuit to preserve their claims receive only limited relief. Cross-appellants argue that requiring class members to file multiple individual appeals and re-applications undermines the advantages provided by class actions since parties are forced to bring repetitive additional claims before the Secretary and the court.

However, this limitation of remedial relief was within the district court's power. Although the court tolled the sixty-day administrative limitations period for those who were initially unaware of the Secretary's unlawful policy, claimants were not entitled to rely on the maintenance of the class action to preserve their rights without reapplying for benefits. Requiring individuals to file new applications during the course of this suit would not have been a useless exercise because changing vocational factors (as time passed applicants grew older and had fewer employment options available to them) and deteriorating medical conditions might well have resulted in different conclusions. Indeed, several of the named plaintiffs eventually received favorable decisions under the Secretary's standards. Accordingly, Judge Carter's different treatment of subclass members who merely claimed entitlement to benefits, but failed to appeal, and those who continued to challenge adverse decisions was an appropriate exercise of discretion.

We have reviewed the parties' other contentions and find them without merit.

### CONCLUSION

Heart disease is one of the most baffling and insidious disabilities to plague humanity. It cannot be diagnosed by simple measures nor cured by any panacea. The Secretary does not serve congressional intent or the public by closing out light in diagnosing or treating this illness. While we recognize that our decision today adds to the Secretary's already heavy burden of complying with the Act, Congress, by requiring individualized disability assessments, has dictated the result: the Secretary should consider all available relevant evidence when evaluating claims of ischemic heart disease.

Accordingly, the judgment of the district court is affirmed.