Charles E. STEWART, Plaintiff,

v.

Kenneth S. APFEL,[1] Commissioner of Social Security,[2] Defendant.

No. 95–CV–403.

United States District Court, N.D. New York.

March 9, 1998.

---

1. Effective September 29, 1997, Kenneth S. Apfel, acting Commissioner. FRCP 25(d)(1).

2. Responsibility for Social Security cases has been transferred from the Secretary of Health and Human Services to the Commissioner of Social Security effective March 31, 1995. Social Security Independence and Program Improvement Act of 1994, Pub.L. No. 103–296 (1994)(codified at 42 U.S.C. § 301 et seq.). The Commissioner of Social Security is therefore substituted for the Secretary of Health and Human Services. *Id.* § 106(d)(transition rules).

Legal Aid Society of Northeastern New York, Saratoga Springs, NY, for Plaintiff; Mary M. Withington, of counsel.

Thomas J. Maroney, U.S. Atty., Northern District of New York, Syracuse, NY, for Defendant; William H. Pease, Asst. U.S. Atty., of counsel.

## *MEMORANDUM–DECISION and ORDER*

HURD, United States Magistrate Judge.

This matter is brought pursuant to §§ 205(g) and 1631(b)(3) of the Social Security Act ("Act"), as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3), to review a final determination of the Commissioner of Social Security denying plaintiff's claims of Social Security Disability Insurance and Supplemental Security Income. The parties have filed their briefs, including the Administrative Record on Appeal, and the matter has been submitted to this Court without oral argument.

## I. *PROCEDURAL HISTORY*

In 1992 the plaintiff filed an application for Supplemental Security Income and Social Security Disability Insurance pursuant to Title II and Title XVI of the Social Security Act. The plaintiff claimed to be disabled and un-

able to work as a result of a musculoskeletal impairment, personality disorder, and a borderline intelligence. Despite the plaintiff's complaints, his application for Supplemental Security Income and Social Security Disability Insurance was denied on March 12, 1993. On June 1, 1993, plaintiff's request for reconsideration was denied. Consequently, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

On October 1, 1993, a hearing was held before ALJ Joseph F. Gibbons. In a decision dated November 22, 1993, the ALJ determined that the plaintiff was not entitled to disability benefits. Following a request for review, on April 19, 1994, the Appeals Council vacated the hearing decision and remanded the case to the ALJ for further consideration. Thus, on June 28, 1994, ALJ Gibbons conducted a supplemental hearing, and pursuant to the remand by the Appeals Council, obtained testimony from a Vocation Expert. As a result, on August 25, 1994, the ALJ again determined that the plaintiff was not entitled to receive disability benefits.

The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied the plaintiff's request for review on February 8, 1995. Plaintiff now brings this appeal. This Court must determine if the findings of the Commissioner of Social Security are supported by substantial evidence.

## II. FACTS

This court adopts the facts set forth in the plaintiff's brief with any exceptions as noted.

## III. CONTENTIONS

Plaintiff contends that the ALJ's decision was erroneous for the following reasons:

1. The ALJ's decision failed to find that the medical evidence in the nature of the consultative examinations, supported by the testimony of the plaintiff and his wife, sufficiently meet or equaled the listing for a personality disorder entitling plaintiff to disability benefits.

2. The ALJ failed to properly consider or evaluate the severity of the plaintiff's impairments including their combined effect.

3. The ALJ failed to accurately present plaintiff's impairments and functional limitations to the Vocational Expert.

## IV. DISCUSSION

### A. Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence in the record to support such decision. *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988)(citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983)). However, a reviewing court must not substitute its own interpretation of the administrative record so long as there exists substantial support for the decision in the record. *Id.*

Additionally, the scope of review involves determining *both* whether the Commissioner has applied the correct legal standard, and whether the determination is supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987). Thus, where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguably supported by substantial evidence, the Commissioner's decision may not be affirmed. *Id.* at 986.

### B. Five–Step Disability Determination

The regulations of the Secretary mandate that the ALJ follow a five step

evaluation process to determine whether an individual is disabled.[3] *See* Social Security Admin., HHS Federal Old-age, Survivors and Disability Insurance Regulations, 20 C.F.R. §§ 404.1520, 416.920. Step One requires the ALJ to determine whether the claimant is presently engaged in substantial gainful activity ("SGA"). §§ 404.1520(b), 416.920(b). If a claimant is engaged in SGA, he will not be considered disabled. However, if the claimant is not engaged in SGA, Step Two requires the ALJ to determine whether the claimant has a severe impairment. §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from a severe impairment, Step Three requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in Appendix 1, Subpart P. §§ 404.1520(d), 416.920(d). If the impairment meets or equals a listed impairment, the claimant is presumptively disabled. *Ferraris v. Heckler,* 728 F.2d 582, 584 (2d Cir.1984). If the claimant is not presumptively disabled, at Step Four the ALJ must consider whether claimant's residual functional capacity ("RFC") precludes the performance of his past relevant work. §§ 404.1520(e), 416.920(e). At Step Five, the ALJ must determine whether the claimant can do any other work. §§ 404.1520(f), 416.920(f).

The claimant has the burden of showing he cannot perform past relevant work. *Ferraris,* 728 F.2d at 584. However, once the claimant meets that burden, benefits can only be denied by showing, by specific reference to medical evidence, that the claimant can perform some less demanding work. *See White v. Secretary of HHS,* 910 F.2d 64, 65 (2d Cir.1990); *Ferraris,* 728 F.2d at 584. In making this determination the ALJ must

consider the claimant's RFC, age, education, past work experience, and transferability of skills to determine if the claimant can perform other work existing in the national economy. §§ 404.1520(f), 416.920(f); *see New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir. 1990); *see also Ferraris,* 728 F.2d at 585 (four factors used to determine if claimant can perform other work: age, education, physical ability, and work experience)(citing 42 U.S.C. 423(d)(2)(A)).

In the instant case, Step One is met because the plaintiff has not engaged in substantial gainful employment since July 15, 1992. (Tr. 17). In applying Step Two, the ALJ determined that the plaintiff has a severe learning disability and a personality disorder. *Id.* However, in applying the Third Step, the ALJ determined that the plaintiff does not have an impairment or combination of impairments listed in, or medically equivalent to one listed in Appendix 1, Subpart P, Regulations No. 4. *Id.* At Step Four, the ALJ concluded that the plaintiff was not capable of performing his past relevant work as an excavator and maintenance man. *Id.* Finally, in applying Step Five, the ALJ found that the claimant retained the capacity to perform work at exertional levels consistent with the jobs of a surveillance monitor, laundry worker, grounds keeper, and assembly line packer. (Tr. 18). The ALJ's findings at the Fifth Step are in contention.

### C. *Step Five–The Claimant is Capable of Performing Other Work*

As discussed above, at Step Four the ALJ determined that the plaintiff was not capable of performing his past relevant work as an excavator and maintenance man. (Tr. 17). Nevertheless, the ALJ determined that the

---

**3.** A claimant will be considered disabled if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In addition, the claimant's

Physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his past relevant work, but cannot considering his age, education, and work expe-

rience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Therefore, plaintiff must not only carry a medically determinable impairment, but an impairment so severe as to prevent him from engaging in any kind of substantial gainful work which exists in the national economy.

plaintiff retained the residual functional capacity to performs such jobs as a surveillance monitor, laundry worker, grounds keeper, and assembly line packer. (Tr. 18). The plaintiff disputes this determination, claiming that the ALJ's opinion is inconsistent with, and not supported by, the evidence found in the record.

### 1. *Residual Functioning Capacity Standard of Review*

RFC is what a claimant is capable of doing despite his or her impairments. §§ 404.1545(a), 416.945(a). The RFC is determined by considering all relevant evidence, consisting, inter alia, of physical abilities; symptoms including pain;[4] and descriptions, including that of the claimant, of limitations which go beyond the symptoms. §§ 404.1545, 416.945. Physical abilities are determined by the evaluation of exertional and nonexertional limitations in performing a certain category of work activity on a regular and continuing basis. §§ 404.1545, 416.945; *see* §§ 404.1567, 404.1569a, 416.967; 416.969a.

■ Thus, to determine whether a claimant can do a certain category of work, the ALJ must determine plaintiff's strength limitations, or exertional capacity, which include the ability to sit, stand, walk, lift, carry, push and pull. §§ 404.1569a(a), 416.969a(a). Nonexertional limitations include "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." §§ 404.1569a(c)(vi), 416.969a(c)(vi). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990). In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient. *Id.; Ferraris,* 728 F.2d at 587; *Sullivan v. Secretary of HHS,* 666 F.Supp. 456, 460 (W.D.N.Y.1987); *see* §§ 404.1546, 416.946. The RFC is then used

to determine particular types of work a claimant may be able to perform. §§ 404.1545(a), 416.945(a).

"[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." §§ 404.1566(a), 416.966(a). However, "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] live[s] are not considered" to exist in the national economy. §§ 404.1566(b), 416.966(b). If the claimant can do work that exists in the national economy a finding of not disabled will be made. §§ 404.1566(b), 416.966(b). However, if a claimant can do work that does not exist in the national economy, a finding of disabled will be made. *Id.*

■ When a claimant's impairment and related symptoms, such as pain, only impose exertional limitations and the claimant's vocational profile is listed in an Appendix 2 Rule, the Rule is applied directly to determine disability status. §§ 404.1569a(b), 416.969a(b). However, when combined exertional and nonexertional limitations exist, the Appendix 2 Rules provide only a framework for disability determination unless a rule directs a conclusion of disability. §§ 404.1569a(d), 416.969a(d). Thus, when a claimant is incapable of the full range of a certain category of work, the disability evaluation must be made on an individual basis rather than by a mechanical application of the Appendix 2 Rules. *Nelson v. Bowen,* 882 F.2d 45, 46 (2d Cir.1989).

Age, education, past work experience, and transferability of skills are vocational factors to be considered. A person under age 50 is considered a "younger person," whose age will not "seriously affect [claimant's] ability to adapt to a new work situation." §§ 416.963(b), 404.1563(b). Education as a vocational factor is seen to indicate the ability to meet job requirements such as reasoning, communication, and arithmetic. §§ 416.964(a), 404.1564(a). A person with a

---

4. Symptoms such as pain are considered when determining the RFC as well as in determining whether a claimant has a severe impairment, and

at all remaining steps in the disability determination. 20 C.F.R. § 416.929(a), (d).

marginal education is generally considered capable of performing simple unskilled types of work. §§ 416.964(b)(2), 404.1564(b)(2). Similarly, recent work experience may indicate an ability to do a similar kind of work. §§ 416.965(a), 404 .1565(a).

Jobs are classified as unskilled, semi-skilled, and skilled. §§ 404.1568(a)–(c), 416.968(a)–(c). The degree of transferability of job skill may indicate the type of job a claimant can do, which helps to determine if a job the claimant can do exists in the national economy. §§ 404.1568, 416.968.

### 2. *The ALJ's Finding That Plaintiff is Capable of Other Work*

The ALJ's determination that the plaintiff was capable of performing other work is based upon several factors. First, the ALJ noted that the plaintiff's complaints of severe disabling musculoskeletal impairments is inconsistent with the evidence contained in the record. (Tr. 14). Second, it was the ALJ's position that plaintiff's functional borderline range of intelligence was not disabling. (Tr. 15–16). In addition, the ALJ determined that the plaintiff's limited intelligence and alleged personality disorder were not so severe as to deprive him of the capacity to perform other work. *Id.* Finally, the ALJ reported that the Vocational Expert, after considering the plaintiff's alleged physical impairments and mental and psychological limitations, testified that the plaintiff was capable of performing such jobs as a surveillance monitor, laundry worker at a hospital or industry, grounds keeper, and assembly line hand packer. (Tr. 16).

The evidence in the record does not support plaintiff's allegations that he experiences severe disabling musculoskeletal impairments. On February 4, 1992, following an examination of the plaintiff, Doctor Robert Evans ("Evans") opined that the plaintiff was in good medical health. (Tr. 274, 276). In fact, Evans was reticent and confused as to why plaintiff was even applying for disability benefits considering his excellent physical health. *Id.* Likewise, an x-ray of the plaintiff's right knee on July 16, 1992, failed to show evidence of a severe impairment. (Tr. 277). For example, the x-ray report identi-

fied no fractures, bony abnormalities, or joint deformities. *Id.* Moreover, the plaintiff testified that he has not used prescription pain medication on a regular basis or needed any devices for assistance such as a cane or crutch for the treatment of his knee. (Tr. 43, 46, 57).

On November 30, 1992, Doctor Joseph L. Quellman ("Quellman"), an Orthopedic Surgeon, reported that the plaintiff, while complaining of daily knee pain, stated that he could not work because of the pain. (Tr. 281). However, upon examination, Quellman found that the plaintiff walked with no limp and displayed a full range of motion with his right knee. *Id.* In addition, Quellman reported that with respect to plaintiff's right knee there were no signs of instability, crepitus, specific joint line tenderness, or clunk. *Id.* The New York State Department of Social Services ("DSS") also found plaintiff in good health and not disabled from a musculoskeletal impairment. For instance, on February 23, 1993, DSS reported that while plaintiff might have a mild meniscus tear, he was not disabled and possessed no exertional limitations. (Tr. 130).

Considering the lack of regular medical treatment or the need for the systematic use of pain medication, plaintiff's complaints of severe pain in his knee, chest, and back are not credible. It is also noted that the reason plaintiff left his last job, had less to do with alleged exertional limitations than an inability to control his temper. (Tr. 39). Consequently, a review of the plaintiff's own testimony; the medical reports from Evans, Quellman, and DSS; and the remaining evidence contained in the record, establishes that the plaintiff's complaints of severe disabling musculoskeletal impairments are inconsistent with the findings in the record.

The plaintiff maintains that the ALJ ignored the medical reports of consultant examiners Doctor William H. Clements ("Clements") and Doctor David Horenstein ("Horenstein"). On February 19, 1992, Clements physically examined the plaintiff and administered the Weschsler Adult Intelligence Scale–Revised ("Weschsler Scale") and the Wide Range Achievement Test

("Wide Test"). (Tr. 278). The results of the Wide Test indicated that the plaintiff read and spelled at a grade level of 2.6 and 3.7, respectively. *Id.* Likewise, the plaintiff on the Weschsler Scale displayed a verbal I.Q. of 74, performance I.Q. of 79, and a full scale I.Q. of 75. *Id.* Clements reported that the plaintiff was functioning in the average range for perceptual motor functioning; low to average range for social judgment and common sense; and below average range for short term memory, auditory sequential memory, and eye hand coordination. *Id.* Diagnostically, Clements concluded that the plaintiff was functioning in the lower limits of a borderline retarded range. *Id.*

In addition to the mental examination, Clements performed a consultative psychiatric examination on February 19, 1992. (Tr. 279). Factually, Clements reported that the plaintiff spent a weekend as an inpatient in the local mental health unit. *Id.* Apparently, the plaintiff became suicidal and was acting out problems following the separation from his first wife. *Id.* However, after two follow-up sessions with an outpatient counselor, the plaintiff discontinued any course of psychiatric treatment and has denied the need to use psychotropic medications. *Id.* Clements indicated that the plaintiff admitted to having problems with authority figures including bosses and policemen. *Id.* Clements additionally reported that the plaintiff stated that he could do some chores around the house and engage in such social activities as talking on the CB radio, playing cards, visiting his mother, and going to Bingo. (Tr. 280). However, Clements also reported that the plaintiff evidenced no particular insight and that his judgment for situations was only fair to good. *Id.* Ultimately, Clements concluded that the plaintiff evidenced vocational maladjustment, borderline mental functioning, and a personality disorder that is manifested in conflicts with authority figures. *Id.*

On January 15, 1993, the plaintiff was interviewed by Horenstein for a psychiatric evaluation. (Tr. 282). Like Clements, Horenstein reported that the plaintiff expressed problems with authority figures. (Tr. 283). In addition, Horenstein noted that the plaintiff had been arrested many times for harassment and assault, all involving conflicts with his subsequent wife and girlfriends. *Id.* The plaintiff also stated that he cannot take orders from others, and that if he went back to work he would just end up getting fired. *Id.* Regarding plaintiff's mental status, Horenstein reported that his speech was clear with no evidence of thought disorder or confusion, and it appeared that the plaintiff had borderline intelligence. (Tr. 284). Ultimately, Horenstein concluded that plaintiff's most significant disorder involved a long standing personality disturbance. (Tr. 284). While vocational rehabilitation was a possibility, Horenstein suggested that success was unlikely because it was his position that plaintiff would not apply himself or maintain necessary self control in a work setting. *Id.* While the reports of Clements and Horenstein both suggest that the plaintiff's impairments present limitations, neither suggests that plaintiff is incapable of working.

In addition to the reports from Clements and Horenstein, the record contains additional evidence in the form of functional evaluations regarding plaintiff's psychological and mental limitations. However, each evaluation fails to support plaintiff's claim that he is incapable of working as a result of a mental or psychological impairment. An evaluation dated March 17, 1992, reports that plaintiff is moderately limited in his ability to accept instructions and respond appropriately to criticisms from supervisors. (Tr. 100). Although plaintiff has a borderline intelligence, the evaluation concluded that he is capable of meeting the demands of unskilled labor. (Tr. 101). Psychologically, the evaluation indicated that plaintiff displayed symptoms of an affective disorder, sub intellectual functioning, and a personality disorder. (Tr. 105–107). Despite such impairments, the evaluation further indicated that the plaintiff's degree of limitation was only slight with respect to maintaining social functioning. (Tr. 109). Similarly, a May 21, 1992 evaluation, found that the plaintiff displayed borderline intelligence without significant limitations in his understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 79–81). Again, psychologically, the evaluation indicated that the plaintiff displayed signs of sub intellectu-

al functioning and a personality disorder. (Tr. 82). Likewise, plaintiff's degree of limitation was listed as slight regarding daily living activities, moderate with respect to difficulties in maintaining social functioning, and often for deficiencies of concentration.[5] (Tr. 89).

The claim that the plaintiff is disabled as a result of borderline intellectual functioning is also contradicted by plaintiff's own testimony and necessarily inconsistent with plaintiff's activities and past performance in high school. For instance, plaintiff testified that he was able to complete the twelfth grade and graduate from high school. (Tr. 38). Although he claims he cannot read or write, plaintiff possesses a driver's license and indicates that he is able to drive an automobile. (Tr. 45). In addition, while the records from plaintiff's high school confirm that he functions in the low average range, they do not suggest, as the plaintiff now claims, that he is severely limited intellectually and as a result disabled from performing work. For example, on February 10, 1987, plaintiff's school Psychologist, Myles P. Gross ("Gross"), reported that plaintiff was functioning within the dull normal to borderline range of adult intelligence. (Tr. 258). Also, Gross stated that the plaintiff demonstrated relative strengths in understanding part and whole relationships, and his approach to problem solving. *Id.* Gross concluded that while plaintiff had significant difficulty in all verbal tasks, he possessed good organizational skills, worked earnestly, and, if given enough time, would succeed. *Id.*

Given the conclusions from the evaluations of plaintiff's mental and psychological limitations; the plaintiff's testimony regarding his ability to take care of his personal needs, operate a motor vehicle, and possess a driver's license; and the opinion of the school psychologist coupled with the fact that plaintiff graduated from high school; the claim that the plaintiff possesses the capacity to work is undoubtedly supported by substantial evidence.

Finally, considering that the plaintiff's complaints of severe disabling musculoskeletal impairments are inconsistent with the findings in the record; that the allegations that he is disabled as a result of borderline intellectual functioning and a personality disorder are not supported by the psychiatric functional evaluations, plaintiff's testimony regarding his daily activities, and plaintiff's past performance in high school; the record amply supports the determination that plaintiff can perform work which includes such jobs as a surveillance monitor, laundry worker, grounds keeper, and assembly line hand packer. Nevertheless, the determination that plaintiff possesses the capacity to work is further buttressed by the testimony of the Vocational Expert, Esperanza DiStefano ("DiStefano").

DiStefano testified that she was familiar with the various exertional levels of work, the educational requirements necessary for different types of jobs, and whether particular types of work exist in significant numbers in the national economy. (Tr. 65). In addition, DiStefano indicated that she was informed of plaintiff's limited ability to read and write, his borderline intellectual functioning, and the particular mental and psychological impairments as reported by Clements. (Tr. 67). As a result, DiStefano opined that the plaintiff's personality disorder, manifested by conflicts with authority figures, would limit the number of unskilled jobs plaintiff might otherwise be capable of performing. (Tr. 68). Nevertheless, despite the limitations posed by plaintiff's personality disorder and alleged physical and mental impairments, DiStefano concluded that there were still unskilled jobs existing in significant numbers in the national economy that plaintiff could perform. *Id.* Specifically, DiStefano testified that plaintiff was capable of performing such jobs as a surveillance monitor, laundry work-

---

5. An additional evaluation performed in February of 1993 repeats similar findings. (Tr. 121–29). Essentially, the evaluation indicates that the plaintiff has borderline intelligence and a personality disorder. (Tr. 121). Consistent with the prior evaluations, the 1993 evaluation reports no limitations regarding plaintiff's daily living activities, only moderate difficulties in maintaining social functioning, and seldom deficiencies of concentration. (Tr. 128). Moreover, the evaluator suggests that the plaintiff's declarations that he cannot work may be a product of malingering. (Tr. 130).

**194**

er, grounds keeper, and assembly line hand packer. (Tr. 69–71).

Following a review of the medical reports from Evans, Quellman, and DSS; the consultative examinations by Clements and Horenstein; the plaintiff's testimony regarding his daily activities; plaintiff's past school performance including the fact that he was able to graduate from high school; and the testimony from the Vocational Expert; it is apparent that the ALJ's determination that the plaintiff is able to work is supported by substantial evidence.

## V. CONCLUSION

Accordingly, the decision denying the plaintiff disability benefits is **AFFIRMED.**

IT IS SO ORDERED.