**Nellie RIVERA o/b/o Joshua Brignoni, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 99 CIV 3945 AKH.**

United States District Court, S.D. New York.

May 15, 2000.

---

James M. Baker, New York City, for Plaintiff.

Nellie Rivera, New York City, Pro se.

Susan D. Baird, Mary Jo White, United States Attorney, S.D.N.Y., New York City, for Defendant.

## MEMORANDUM AND ORDER

HELLERSTEIN, District Judge.

The parties dispute, and I am asked to decide, whether, during remand to the Social Security Administration, I may award interim disability payments to the plaintiff, a minor child. I hold that I may, in the special circumstances presented by this case. My holding is contrary to decisions of the Fourth and Tenth Circuit Courts of Appeals, but is consistent with decisions in this Circuit, the statutory purpose, and basic principles of equity.

Plaintiff has appealed from an order of the Commissioner of Social Security which held that the plaintiff, Joshua Brignoni, was not sufficiently "disabled" to be entitled to Supplemental Security Income. Both sides have now agreed that the case should be remanded because of a deficient administrative record and inadequate hearing procedures. As a result, a long three-and-a-half year process is made still longer, and the Congressional purpose of providing benefits to children, early in their disability when coping and compensating tactics have the greatest chance of success, is frustrated. Without interim disability payments during remand, plaintiff will suffer irreparable injury. Furthermore, since it appears from the supplemental information that the Ad-

ministrative Law Judge failed to consider that plaintiff will probably succeed or, alternatively, that there are sufficiently serious questions going to the merits to make them fair ground for litigation and the balance of hardships tips decidedly in plaintiff's favor, the traditional tests for equitable relief are satisfied.[1] I hold, therefore, that equitable relief in the form of interim disability payments should be paid to plaintiff to avoid further irreparable injury.

### Procedural History

On November 27, 1996, Nelly Rivera filed for Supplemental Security Income payments on behalf of her son, Joshua Brignoni. Joshua, born April 5, 1987, was then nine-and-a-half years old. He had been diagnosed as suffering from attention deficit disorder and behavioral and psychological difficulties. His mother and his school reported that he was often disruptive in class, fought with children, lied, refused to follow instructions, spoke out of turn, did not remain in his seat, exhibited poor concentration and performed well below grade level. See Tr. p.11. At nine-and-a-half years, he was still in the second grade at school, working at first grade level. See id., pp.115–122; Pl. Mem. p. A–2.

Joshua was the oldest of four children. His mother suffered from serious asthma and psychological problems, and had difficulty coping with her children. Joshua's natural father had abandoned his family, and a successor step-father had also removed himself. A succession of doctors had observed Joshua's behavioral difficulties, and some had given him psychological tests, but none, it appeared, had treated him or put him under any regime of medication. He was in a special school program, the Individualized Education Program ("IEP") and, at its direction, various

**1.** *See, e.g., SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharmaceuticals, Inc.,* 211 F.3d 21, 24–25 (2d Cir.2000); *Phillip v. Fairfield University,* 118 F.3d 131 (2d Cir.1997).

psychological and intelligence tests had been given to Joshua.

Congress, since 1974, has provided for Supplemental Security Income payments to disabled children from low income families. *See* 42 U.S.C. § 1382(a). Disability requires a finding that the child has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations". *Id.*, § 1382c(a)(3)(C). The implementing regulations prescribe detailed, definitional criteria. *See* 20 C.F.R. §§ 416.924, *et. seq.* The definitional criteria must be satisfied directly, or by medical or functional equivalence. *Id.*, § 416.924(d).

On April 24, 1997, the Social Security Administration ("SSA") denied Joshua's claim of disability. SSA determined that Joshua's condition "does not limit him from doing things that other children his age normally can do to the extent required by our rules." Tr. P. 40. Ms. Rivera moved for reconsideration, but her motion was denied. On September 22, 1997, Ms. Rivera requested a hearing before an Administrative Law Judge ("ALJ").[2]

The administrative record was enlarged and updated but, as will appear, not to any sufficient degree. Dr. Richard King, who had seen Joshua in connection with his original application, saw Joshua again on June 26, 1997 and reported a learning disorder. Dr. Eve Langer of Metropolitan Hospital gave Joshua a "preliminary examination" on November 20, 1997, noted that Joshua's mother had told her that Joshua had "a quite severe learning disability" and had difficulty "to concentrate or focus on homework" and, without conducting any tests of Joshua's neurocognitive processes or her own preliminary observation that "an underlying depression may exist" (Tr. p.159), ascribed Joshua's "primary difficulty" as a "parent-child interactions/conflict, exacerbated by his slow learning." [3]

Upon this slim record, the ALJ conducted a hearing on February 23, 1998. The ALJ did not consider, or place in the record, the IQ and other cognitive tests that had been administered at IEP's request because of Joshua's limited intelligence and serious behavior disorders. The record did reflect a report of an IQ score of 81 by a consulting psychologist, Dr. Rochelle Sherman, but does not reflect the IQ score of 71, reported by the IEP on the basis of a more sophisticated test. *See* Pl. Mem. p.30; Tr. pp.11, 128.[4] The administrative record also failed to reflect that Dr. Fiona Graham recently had examined Joshua at Metropolitan Hospital on December 4, 1997, and had diagnosed him as having "major depression," (Pl.Mem. p. A–11), in contrast to a report two-and-a-half years earlier by a Dr. Leal that Joshua's mood was "generally euthymic," (Tr. p.12), that is, cheerful, an observation that appears inconsistent with everything else known about Joshua.

The entire hearing conducted by the ALJ covered only eight pages of transcript. *See* Tr. pp. 26—34. The ALJ's examination of Dr. Edward Halperin, the psychiatrist brought in to serve as an impartial adviser to the ALJ, was limited to four leading and conclusory questions, and the ALJ cut off Dr. Halperin when he tried to provide details. *See* Tr. pp. 31–2. The ALJ failed to advise Ms. Rivera, acting *pro se*, of her right to question Dr.

---

**2.** Pursuant to 42 U.S.C. § 405(b) (am.1994), upon proper and timely request, a hearing is to be conducted and "on the basis of evidence adduced at the hearing," the Commissioner's findings of fact are to be affirmed, modified, or reversed.

**3.** SSA apparently also ordered a consultation by Dr. Joerg Bose on June 26, 1997, but nothing is known about that consultation. The pages identified as Dr. Bose's report are blank in the Administrative Transcript filed by the Commissioner. *See* Tr. pp.146–51.

**4.** The ALJ opinion does identify Joshua's IQ as 71. But the administrative record does not show the basis of the ALJ's finding nor, more important, the significance of an IQ score of 71, just one point above one regulatory definition of mental retardation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.05.

Halperin, and she asked no questions. During the hearing, Joshua became upset and acted up, apparently fearing that the purpose of the hearing was to remove him from his home and place him in foster care. The ALJ directed that Joshua be removed from the hearing room, but failed to recess the hearing or otherwise give Ms. Rivera an opportunity to add to, or comment on, the evidence. Instead, he remarked that he had "pretty much got[ten] the picture," and cut off Mrs. Rivera's testimony. Tr. p.31. As even the Government now concedes, the record was inadequate.

On April 20, 1998, the ALJ held that Joshua was not disabled under the governing regulations. *See* Tr. pp.7–13. The ALJ accepted that Joshua suffered from ADD and "learning delays" and had "underlying medically determinable impairments," but held that Joshua's symptoms "are not of such intensity and frequency to impose marked and severe limitations." *Id.*

The decision of the ALJ became final on February 1, 1999, when the Commissioner denied Plaintiff's request for review. From the initial filing of the claim to the Commissioner's denial, the administrative process had taken over 26 months. Joshua was 9 years old when the process began, and almost 12 when the SSA's order denying benefits became final. He will be well into his "teen" years by the time the process ends.

### Analysis

This case implicates two important policy considerations: the responsibility of administrative law judges to develop a proper record, and the Congressional intent that disability benefits to minors be available on a timely basis to help minors cope with and overcome their disabilities.

1. *The ALJ's responsibility to develop a full and complete evidentiary record.*

■ A Social Security benefits hearing is considered to be non-adversarial. *See Perez v. Chater,* 77 F.3d 41, 47 (1996). The Social Security Commissioner, and Administrative Law Judges carrying out the Commissioner's adjudicative functions, have an affirmative duty to develop an evidentiary record that is complete and fair. *See id.; Echevarria v. Secretary of Health and Human Services,* 685 F.2d 751, 755 (2d Cir.1982). If an applicant is not represented by counsel, the duty of the Administrative Law Judge is particularly acute, *see Echevarria,* 685 F.2d at 755, especially if the claimant is an infant. *See Marquez o/b/o Infante v. Shalala,* 898 F.Supp. 238, 241 (S.D.N.Y.1995). The ALJ is under a "heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Echevarria,* 685 F.2d at 755; *see generally,* Jon C. Dubin, *Torquemada Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine to Administrative Proceedings,* 97 Colum. L.Rev. 1289, 1302–05 (1997).

■ The administrative record of this case is inconsistent with the Congressional policy. The ALJ failed to act with promptness, and failed to compile a proper record. He relied on out of date and incomplete records, relied on secondary and preliminary characterizations when primary records were available, failed to obtain current information, and questioned witnesses in a perfunctory manner. Twenty-six months to produce an administrative record of such glaring deficiencies reflects an indifference to the Congressional purpose. And now further delay is in the offing, for a remand will put this case back to the beginning. It is as if the 26 months covered by the administrative process has been wasted, producing delay and frustration to the infant claimant and to the Congressional intent.

2. *The legislative purposes to aid children while they are children.*

■ "The purpose of providing SSI benefits to minor children is to provide benefits to children while they are chil-

dren, thus enabling them as 'among the most disadvantaged of all Americans,' to enter society as 'self-supporting members.'" *Maldonado v. Apfel,* 55 F.Supp.2d 296, 307 (S.D.N.Y.1999) *quoting* H.R.Rep. No. 92–231 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5133–34; *see also Harris v. Apfel,* 209 F.3d 413 (5th Cir.2000). Undue delay in the award of benefits undermines this goal, and can be "tantamount to a denial of benefits." *Maldonado,* 55 F.Supp.2d at 308. Thus, the administrative process in adjudicating entitlements by minor children to disability benefits, and the review process in the district courts, must be conducted in a manner sensitive to the Congressional purpose that benefits, if due, should be awarded while they can be efficacious, that is, during infancy and as early as possible when a disability appears. It needs no citation to state a truism: disabilities are best overcome before they are embedded in the psyches and behavior of sensitive children. *See, e.g.,* Mary Lynch, *Who Should Hear the Voices of Children with Disabilities: Proposed Changes in Due Process in New York's Special Education System,* 55 Alb. L.Rev. 179, 186–87 (1991) ("[C]hildren with learning disabilities need early intervention before their needs become compounded by frustration and emotional difficulties arising from the learning problem.... The longer they maintain inappropriate behavior, the more difficult it is to eradicate those behaviors.").

### 3. *The conditions of Joshua's impairments.*

Under 20 C.F.R. § 416.924(d), a claim for Supplemental Security Income is to be accepted if the Commissioner determines that the applicant's condition "meets, medically equals, or functionally equals" an impairment listed in the regulations. One such impairment listed in the regulations,

the only one discussed by the ALJ, is attention deficit hyperactivity disorder ("ADD"). *See* 20 C.F.R. Pt. 404 Subpt. P, App 1, Listing 112.11. But other disabilities also appear to be applicable, such as mental retardation, (*see id.,* Listing 112.05), and the mood disorder, major depressive syndrome (*see id.* Listing 112.04).

■ The medical record suggests that petitioner's condition is likely to meet the criteria mentioned above. Under Listing 112.04, a child qualifies as disabled with a mood disorder if he suffers from "major depressive syndrome" as defined in the regulation, and if such syndrome causes marked impairment in at least two of the following four areas: cognitive functioning, social functioning, personal functioning, or concentration. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 112.04. Dr. Graham's diagnosis of "major depression" appears to qualify under the definition of major depressive syndrome, and there is evidence that Joshua is impaired in his cognitive functioning, social functioning, and concentration. Under Listing 112.05(E), a child has the disability of mental retardation if his IQ is measured between 60 and 70 and he has a marked impairment in social functioning, personal functioning, or concentration. *See id.* Listing 112.05(E). Because petitioner's IQ was measured as 71, only one point above the listed range, and it is difficult to measure IQ with precision, a finding that petitioner's disability is equivalent to that listed in 112.05(E) also seems likely. *See Prentice v. Apfel,* 96 Civ. 851, 1998 WL 166849 (N.D.N.Y. April 8, 1998) (finding that an IQ slightly above definition of mental retardation supports a claim of equivalence).[5]

I do not intend by this discussion to dictate an outcome on remand, for that

---

**5.** Petitioner may also qualify as mentally retarded under Listing 112.05(D), which requires an IQ between 60 and 70 and a "physical or other mental impairment imposing additional and significant limitation of function." 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 112.05(D).

task is properly left to the Commissioner. My discussion is intended to show, for the purpose of equity analysis, that petitioner is likely to succeed on the merits, or at least has raised substantial issues going to the merits with the balance of the equities tipping decidedly in his favor. And, as previously noted, if petitioner does not receive deserved interim benefits when it may do him good, petitioner will suffer irreparable injury, for later, the damage inflicted by disability may have become irreversible. Thus, the standard tests for awarding equitable remedies are satisfied (*see supra*, note 1).

### 4. *Whether Equitable Remedies Are Available.*

 The district courts are not the supervisors of the Social Security Administration's administrative responsibilities. *See Heckler v. Day*, 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984). Congress created a comprehensive statutory structure within which SSA functions and, if administrative determinations are slow, the district courts may not order a hastening of determinations by seeking to impose judicially-mandated deadlines. *See id.* at 119, 104 S.Ct. 2249. Two courts of appeals have stretched that caution into holdings that the district courts also lack the right to order interim payments to petitioners for disability payments. *Doughty v. Bowen*, 839 F.2d 644, 647 (10th Cir.1988); *Taylor v. Heckler*, 769 F.2d 201, 202 (4th Cir. 1985). For the reasons that are developed below, I hold that *Doughty* and *Taylor* should not be extended to prevent needed equitable relief to minor children.

*Heckler v. Day* was a class action of "[a]ll present and future Vermont residents seeking to secure Social Security disability benefits", who were unable to obtain timely determinations of their disabilities because of undue delay by the Social Security Administration. The district court issued an injunction mandating that SSA, on remand, give case-by-case consideration of the claims of each class claimant within a 90 day period or, failing timely resolution, pay interim benefits to each such class claimant. The court of appeals affirmed, but the Supreme Court reversed, holding that such judicially imposed deadlines on the administrative process would constitute an "unwarranted judicial intrusion" on SSA's responsibilities. *Day*, 467 U.S. at 119, 104 S.Ct. 2249. The Supreme Court observed that Congress had heavily regulated Social Security disability benefits, and had struck an appropriate balance as to the timeliness, quality, and oversight of administrative determinations. Thus, the courts should not intrude into the timeliness of the administrative process. The Supreme Court did not rule, however, on the district court's equitable powers generally, or question if they remained available to avoid irreparable injury.

*Doughty* and *Taylor* followed *Heckler v. Day*. In both *Doughty* and *Taylor*, adults, claiming disability, complained of undue delay by SSA, initially and in the prospect of remands by the district courts for further administrative proceedings. The district courts ordered interim benefits to be granted following remand and while further consideration was being given to their applications by the Commissioner. The Fourth and Tenth Circuits reversed, holding that interim benefits were intended to be the equivalent of judicially imposed deadlines, and that *Heckler v. Day* forbade such judicial intrusion. *Doughty*, 839 F.2d at 647; *Taylor*, 769 F.2d at 202.

*Doughty* and *Taylor* considered that Congress had provided for interim disability benefits in a different instance, where SSA had initiated a proceeding to terminate disability payments because, in SSA's view, the respondent was no longer disabled. Since Congress provided that interim benefits should be paid in that instance, where the Social Security Administration brings proceedings to terminate previously-awarded disability benefits, *Doughty* and *Taylor* held that Congress must have intended that there should be

no other instance where interim benefits should be awarded. *Doughty,* 839 F.2d at 647; *Taylor,* 769 F.2d at 202.

Congress, in passing section 423(g) in 1987, had responded to considerable criticism of administrative high-handedness, and had provided that SSA could not simply stop payments by administrative fiat; interim payments should continue until, after hearing and determination by an administrative law judge, a respondent was adjudicated to be no longer disabled. *See* 42 U.S.C. § 423(g) (1988); 133 CONG. REC S17584-01 (daily ed. December 9, 1987) (statement of Sen. Moynihan).

There is no suggestion in the legislative history that section 423(g) was intended to affect the general equity powers of the district courts. The holding of *Doughty* and *Taylor,* that section 423(g) somehow manifested a Congressional intent to divest the courts of normal equitable powers with regard to interim disability compensation has no better support than the hoary maxim: *Expressio unius est exclusio alterius,* the expression of a particular must mean the exclusion of the general.

 *Expressio unius* is a maxim to guide statutory interpretation; it is not a rule of law, and it is not an excuse to avoid hard analysis. *Neuberger v. Commissioner of Internal Revenue,* 311 U.S. 83, 88, 61 S.Ct. 97, 85 L.Ed. 58 (1940); *Westnau Land Corp. v. U.S. Small Business Administration,* 1 F.3d 112, 116 (2d Cir. 1993). If a remedy as fundamental as equity is to be forbidden by law, the law must be specific and clearly so intend. It cannot be a by-product of a statute intended to solve a particular problem arising from a particular practice. *See, e.g., Day*

*v. Schweiker,* 685 F.2d 19, 24 (2d Cir.1982), *rev'd on other grounds, Heckler v. Day,* 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984) (authority to award interim benefits derives from district court's "inherent powers to fashion a remedy"); *Davila v. Shalala,* 848 F.Supp. 1141, 1145 (S.D.N.Y. 1994) (Broderick, J.); *Saltares v. Bowen,* 711 F.Supp. 162, 165 (S.D.N.Y.1989) (Kram, J.); *Weiser v. Secretary of Department of Health and Human Services,* 645 F.Supp. 602, 603 (S.D.N.Y.1986) (Conner, J.); *Cohen v. Heckler,* 599 F.Supp. 837, 838 (S.D.N.Y.1984) (Haight, J.). And, clearly, nothing in *Heckler v. Day* forbids a district court from exercising its traditional equity powers where, in the particular case, the court finds that the interest of justice so require; indeed, the Supreme Court specifically acknowledged that authority. *Day,* 467 U.S. at 119 n. 33, 104 S.Ct. 2249.

### 5. The Nature and Purpose of Equity.

 A court's equitable jurisdiction serves to allay the injustice of time; where a claimant can show probability of success and irreparable damage from delay, a court may award relief *pendente lite* to prevent irreparable change in the status of the litigants or the conditions affecting them. *See Brenntag International Chemicals, Inc. v. Bank of India,* 175 F.3d 245, 249-50 (2d Cir.1999); *Hamilton Watch Co. v. Benrus Watch Co., Inc.,* 206 F.2d 738, 742-43 (2d Cir.1953). That should be the case here. Equity begins when the remedy at law is inadequate. Just as the Chancery Courts in medieval England stood side by side with Kings Bench, administering justice when the law was inadequate to do so [6]; just as equity affected rights and

---

**6.** *See* Timothy S. Haskett, *The Medieval English Court of Chancery,* 14 L. & Hist. Rev. 181, 184, (1996); ("The Chancellor ... was supplementing the common law ... ultimately traceable to the notion that the king must provide justice.... Holdsworth identified three main factors that shaped the development of chancery equity: antagonism to the rigidity of common law; ideas about the function of conscience in determining equitable

rules; and a procedure, distinct from that of the common law, that allowed the chancellor to decide the most equitable course to take in each individual case.... It was the inflexibility and technicality of common law rules that produced the need for the intervention of chancery equity. Therefore this equity necessarily followed the law, supplementing and correcting it."); Stephen N. Subrin, *How Equity Conquered Common Law: The Federal*

remedies in the early American state and federal courts[7], so is it the case in the district courts today, for law and equity are merged within their jurisdiction. *See* Subrin, *supra,* at 266–276.

Equity, as a necessary supplement to law and to provide justice where legal remedies are inadequate, is as old as law itself, perhaps older. Abraham, challenging God before the imminent destruction of Sodom and Gomorrah, called for equity: "Shall not the judge of all the earth deal justly?" *Genesis* 18:25. God, acknowledging that strict application of general laws could not assure justice in the particular, instructed that judges deliver *"righteous* judgment"; "justice, justice shall you pursue that you may thrive and occupy the land that the Lord your God is giving you." *Deuteronomy* 16:18.

■ Talmudic interpretation and commentary furthered this fundamental proposition. As the rabbis, instructing judges two millennia ago, taught: "See what you are doing, for it is not before man that you judge, but before the Lord". And God, they taught, "stands in the congregation of God". Thus the judge, in that awesome presence, "must first justify his decision in his heart, and only afterwards [resolve the] Halakhic question [the question of law]". Talmud, Sanhedrin 6B, 7B (Steinsaltz ed. (1996) vol. 15, at pp. 58, 72 (1996)). As the foremost modern commentator of the secular reception of ancient Jewish law puts it:

> ... There exists the general truth of legal rules and the individual truth of specific cases. A judge does not discharge his obligation if he decides only according to general truth; he must ren-

der not only a "true judgment" but one "true to its very truth," *i.e.,* the perfect truth of the specific case. . . .

1 M. Elon, Jewish Law, 251 (1988).[8] Since, as Professor Elon puts it, God is both just and equitable (*tsaddik v'yashar* ) and "all his ways are just", general rules of law should be tempered by equity when they do not fit particular cases. *See id.,* (commenting on Talmudic commentary on *Deuteronomy* 32:4); *see also,* Aristotle, Ethics 5:13, *quoted in* Elon, *supra,* at 248 ("[T]he just man excels with respect to the prevailing laws ...; [b]ut the equitable man is the one who perfects and refines the prevailing laws by making exceptions to these general rules, to the extent necessary, when, for whatever reason, the legislator, if then present, would not have applied the prevailing laws himself.").

### 6. *Equity as Serving the Statutory Purpose.*

■ I have previously remarked on the Congressional purpose to provide payments to disabled minor children early in their disability to provide such children with the possibility to enter the mainstream of life and learn vital civic habits of responsibility and discipline. Congress has also provided for recoupment by the Social Security Administration when payments are made in error. *See* 42 U.S.C. § 404(a) (am.1968); *Cohen* 599 F.Supp. at 839 (applying recoupment and overpayment procedures provided by Social Security regulation). Thus, interim payments to probably disabled minors pending adjudications regarding their disability, serve the Congressional purpose, avoid or ease irreparable injury to the minor child and,

*Rules of Civil Procedural in Historical Perspective,* 135 U. Pa. L.Rev. 255, 258–59 (1987) ("Equity grew interstitially, to fill in the gaps of substantive common law... and to provide a broader array of remedies 'specific performance, injunctions and accountings.... An expansive equity practice developed as a necessary companion to common law.' ").

7. *See* Subrin, *supra,* at 260–261 ("After 1776, ... [m]any states established separate equity

courts, or specifically permitted their common law judges to hear equity cases or to apply equitable principle and grant equitable remedies.").

8. Professor Elon of the law schools of the Hebrew University, Jerusalem, and New York University, New York, is a former Justice of the Supreme Court of Israel.

since they may be recovered if determinations ultimately favor the position of SSA, do not prejudice SSA or the public.

■ This case, unlike *Heckler v. Day* and unlike *Doughty* and *Taylor,* does not present an issue of judicial intrusion in the administrative process. I am asked to decide only if interim benefits may be awarded where the interest of justice makes such an order appropriate and necessary. My order does not establish any time period, short or long, within which SSA must proceed. There is no reason to believe that my award of interim benefits will require SSA to proceed more expeditiously than would otherwise be the case. Indeed, an award of interim benefits may allow SSA to take the time necessary to conduct a full evidentiary review.

### 7. *Conclusion.*

SSA's administrative procedures have stretched unreasonably long and have been deficient and wasteful. The Congressional policy of awarding disability payments to minor children during their minority, early in their disability, has been thwarted, and can best be served by awarding interim benefits. Accordingly, plaintiff's motion for remand, joined by defendant, is granted (*see* 42 U.S.C. § 405(g)). Pending final determination by the Commissioner, the Commissioner shall provide Plaintiff with the level of benefits he would receive were he successful in his application, subject to recoupment pursuant to 42 U.S.C. § 404 if it is ultimately determined that the benefits paid were not due.

SO ORDERED.